KIMBALL BROTHERS COMPANY, Appellee, v. CITIZENS GAS & ELECTRIC COMPANY, Appellant.

**Corporations:** CONTRACT BY AGENT: PROOF OF AUTHORITY. Where a company undertakes to perform a contract made by its managing officer, thus ratifying the contract to that extent, no showing of previous authority of the officer to make the contract is necessary to bind the company.

**Agency:** EVIDENCE. A witness who has observed the manager of a company in the actual transaction of its business may testify to the fact of his agency.

**Same.** Recognition of a contract made by an agent is sufficient proof of his agency and authority to make the contract.

**Breach of contract:** EVIDENCE: RESULT OF EXPERIMENT. In a damage action for failure to furnish electrical power as agreed to operate plaintiff's elevator, in which the plaintiff claimed that the trouble was with plaintiff's motor to which the power was applied, the court in its discretion properly admitted evidence of the result of a test of the motor, shown to have been made under practically the same conditions as when installed in plaintiff's plant.

**Same:** EVIDENCE. Under defendant's claim, in an action for failure to furnish electrical power as agreed, that plaintiff, knowing defendant's system, furnished a motor which was not adapted to its current and it appearing that the motor had been tested, the testimony of an electrical engineer as to the inadaptability of the system to the motor furnished was admissible.

**Instructions:** LAW OF THE CASE. The instructions given upon a trial are the law of the case and the jury is bound to follow them whether right or wrong.

**Breach of Contract:** EVIDENCE. In the instant breach of contract case the evidence is held sufficient to support a finding that defendant agreed to furnish a certain voltage of electricity for plaintiff's motor.

**Breach of contract:** DAMAGES: RECOVERY. The general rule is that a party who has suffered damage by reason of a breach of contract can recover only such damages as naturally arise from the breach, or such as may have been within the reasonable contemplation of the parties as the probable result of a breach; and it is the duty of the injured party to use reasonable diligence to minimize the damage, and he can not recover that which he might have avoided by the exercise of ordinary care and reasonable expense.

**Same:** CONTRACT FOR ELECTRICAL POWER: BREACH: DAMAGES. Defendant contracted to supply plaintiff with certain electrical power to operate its elevator but was unable to do so because its current was not adapted to plaintiff's motor. Defendant for about a year attempted to overcome the difficulty but failed and abandoned further efforts, and thereafter for the space of two years plaintiff accepted and paid for such power as it could furnish, when it changed its system and was able to furnish the current contracted for. *Held,* that plaintiff was only entitled as damages to the difference between the rental value of its buildings with the

current as supplied and their rental value had the contracted current been supplied, up to the time defendant abandoned efforts to furnish the agreed current; and for a reasonable time thereafter in which to change the system so as to get the required power, together with the reasonable expense of making the change, and not the difference in rental value up to the time defendant changed its system.

*Appeal from Pottawattamie District Court.*—HON. O. D. WHEELER, Judge.

SATURDAY, DECEMBER 19, 1908.

REHEARING DENIED TUESDAY, MARCH 16, 1909.

ACTION at law to recover damages of defendant for failure to furnish an agreed current of electricity for the purpose of operating an elevator in a building in the city of Council Bluffs owned by the Groneweg & Schoentgen Company. Trial to a jury, verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*Harl & Tinley,* for appellant.

*Clem F. Kimball,* for appellee.

DEEMER, J.—The Groneweg & Schoentgen Company, a corporation engaged in the wholesale grocery business at Council Bluffs, undertook the erection of a large four-story building for the conduct of its business, and it entered into a contract with plaintiff, another corporation, engaged in the manufacture and sale of elevators, to furnish and install a freight elevator in said building with a capacity of six thousand pounds. Electricity was to be the motive power of the elevator. After the plans were all made, a representative of each of said corporations went to the office of the defendant, another corporation engaged

in the business of furnishing light and power, and there met a man by the name of Friechman, who it is claimed was defendant's manager, to know if defendant could furnish the necessary electrical current to run the motor which had been designed for the elevator. According to the testimony, this manager or agent stated that his company could furnish sufficient current, and had such an unlimited quantity of that kind of power that it could "burn up" the motor. Relying upon this statement, the Groneweg Company proceeded with its building, and plaintiff installed the elevator, equipping it with a fifteen horse power, three-phase electric motor made by the Westinghouse Manufacturing Company. The designs for the motor were furnished by plaintiff, and it was built according to these designs. After the elevator and motor were installed, connections were made by defendant with its wires and cables, and it was found that the electrical current supplied by it would not start the motor when the elevator was loaded. Frequent and various attempts were made to correct the defects, but these were unavailing, and it was found impossible to start the motor when the elevator was loaded. It was discovered, however, that if the motor could be started without a load, and a sufficient rate of speed acquired before attempt was made to lift the load, that it would then work to approximately full capacity; but it would not start with a capacity load upon the elevator. Defendant did not generate its own current. Such as it had for sale it acquired from the Omaha Electric Company, which had a plant on the west side of the Missouri River, at Omaha, Neb. The current from this plant was "stepped up" to about five thousand volts, sent across the river to a substation, and there stepped down to a voltage suitable for commercial use.

It seems that during the time material to our inquiry there were two systems whereby the electrical cur-

rent was converted into power for commercial use, one known as the "monocyclic" and the other the "three-phase." Each was three-phase in character, but the monocyclic was quite different from the true three-phase system, in that the monocyclic system was so arranged that the currents passing through the three wires attached to the motor were not of equal intensity or voltage, while in the regular three-phase system the currents were the same. By reason of this fact a true three-phase motor of large size could not be operated successfully with a monocyclic current coming from the connecting wires without the use of a clutch or some other mechanism which would allow the motor to get up full speed before the load was to be lifted. The defendant at the time it is claimed the contract was made was furnishing what was known as the "monocyclic current of electricity," and, having attached its wires to a motor designed for the true three-phase system, it was found that it could not start the motor when the elevator was loaded to capacity, and that without the use of a clutch or other device it could not furnish the amount of power required to successfully operate the elevator when fully loaded. Many attempts were made to correct the difficulty, but none were successful, and defendant did not succeed in making the elevator work until the plant in Omaha changed its entire plant from the monocyclic to the full three-phase system. After that change was made, there was no difficulty in making the motor and elevator work to full capacity. It is claimed that defendant undertook and agreed to furnish the Groneweg Company with an adequate and sufficient electrical current to run the elevator and motor hitherto described, that it failed and neglected to do so, and that the company was damaged by reason of this default in the sum of $1,800, being the rental value of the building during the time the Groneweg Company was deprived of the use of the elevator. Plaintiff is the assignee of the Groneweg & Schoentgen

Company, and as such brings this action.   That the exact issues may be understood, we here copy ·from the petition the following statement of the cause of action:

That defendant promised and agreed to and with the Groneweg & Schoentgen Company to furnish electrical power of a specified current and pressure of a nature and style known as the 'monocyclic alternating current,' with equal potential in the several conductors thereof; that said Groneweg & Schoentgen Company, relying upon said promise, contracted with plaintiff to furnish a fifteen horse power motor attached to and part of an elevator machine to be placed in the warehouse of said Groneweg & Schoentgen Company, and defendant did promise and agree to furnish for said electrical power a monocyclic alternating current of two hundred and thirty volts pressure in each leg of said system; that the defendant wired and led into said warehouse an electrical alternating current, and represented and claimed to said Groneweg & Schoentgen Company that said current from said wires so led to the premises was of a certain potential in each conductor and of sufficient quantity to the uses of certain elevator machinery; that Groneweg & Schoentgen Company purchased from plaintiff an elevator machine, being an induction electrical motor, an approved design adapted to run with a monocyclic alternating electrical current on equal pressure on each leg of said system, and having a specified voltage of two hundred and thirty volts; that the Groneweg & Schoentgen Company erected and built said warehouse, valuable only for use as a warehouse and necessary to have an elevator of a capacity of 6,000 pounds to move rapidly from one floor to another; that plaintiff furnished said elevator machinery and motor to operate the same, and furnished a motor of sufficient capacity and suitable for operating said machinery and adapted to the use of the current and electrical power designated by defendant and contracted for by Groneweg & Schoentgen Company; that defendant failed and neglected to perform its said contract with Groneweg & Schoentgen Company, and did lead and run wires into the said building and connected the same for the use of said motor and machinery, and did promise Groneweg & Schoentgen Company to furnish over said

wires an alternating current on a monocyclic system with a working pressure of two hundred and thirty volts and sufficient current to operate said motor; that defendant ran and connected their wires with said electrical system, knowing the kind and style of motor contracted for by Groneweg & Schoentgen Company, but that defendant willfully and wrongfully refused to furnish said wires and alternating current of monocyclic system having a pressure of two hundred and thirty volts on each leg thereof, and did fail, neglect and refuse to furnish sufficient current and voltage to run any kind of a motor then or since built, and did without any fault or negligence of Groneweg & Schoentgen Company fail to perform their contract, failed and neglected to furnish electricity for power as promised and agreed; that said contract was verbal; that defendant did furnish an alternating current from a monocyclic system, but that said current was less than two hundred and thirty volts under use, and insufficient to operate said motor to its capacity or a sufficient capacity to run said elevator machinery to its full capacity, and failed and neglected to furnish sufficient current in said system to operate said motor or any motor to its full capacity or the full capacity of said machinery, and that, by reason thereof, Groneweg & Schoentgen Company were greatly damaged and kept out of the use of said elevator to its full capacity and forced to transport and lift their goods by other and more expensive means, and deprived of the use of said warehouse, and lost the use of said elevator and warehouse in connection therewith to its full capacity, and that for a period of three months said current furnished by defendant wholly failed to operate said machinery, and said Groneweg & Schoentgen Company were compelled to install direct electric motor connections with the wires of the street car company at great expense and loss to them; that thereafter the defendant improved its apparatus, and did furnish an insufficient current to operate said motor to its full capacity, but sufficient to partially operate said machinery for about thirty months, by which said Groneweg & Schoentgen Company were greatly damaged.

Defendant in answer, in addition to a general denial, alleged that it was operating an electric light plant on

what was known as the "monocyclic three-phase system,"
and had been operating the same for many years; that
both plaintiff and its assignee were familiar with the sys-
tem, and knew it was being used by defendant; that not-
withstanding this they equipped the elevator with a full
three-phase system motor, instead of a monocyclic one, and
that they attempted on their own motion to utilize a mono-
cyclic current for the operation of a three-phase motor,
which could not be successfully done, and that whatever
damage was suffered was due to this and not to any fault
of defendant.  It denied any contract or agreement to make
the three-phase motor work with the current it was furnish-
ing, and alleged that the fault was due to the inadapta-
bility of the motor to the current which it, defendant, un-
dertook to furnish.  It also averred that, had the motor
been supplied with a clutch, it could have been made to
work, and that the only difficulty experienced was in start-
ing the same when the elevator was loaded to full capacity.
It also alleged that the elevator was run with more or less
of a load during all the time for which plaintiff is seeking
damages, and that, after the change of its system, it was
satisfactorily operated.  Such were the issues made by the
pleadings, and upon trial to a jury a verdict was returned
for plaintiff in the sum of $1,000.  The appeal presents
many questions for our consideration, but it is not neces-
sary in view of our final conclusion to notice all of them.

I.  Claim is made that there is not sufficient testimony
to show the authority of Friechman to make the contract
alleged for and on behalf of the defendant.  We think
there was enough testimony to take the case
to the jury on this issue.  It was shown that
Friechman was in charge of defendant's
Council Bluffs office; that he was the local manager, and
had control of the power and service furnished by defend-
ant; and that, by reason of the alleged contract with the
Groneweg Company, defendant undertook to furnish power

1. CORPORATIONS: contract by agent: proof of authority.

for the operation of the elevator. It was by reason of the contract with this manager that defendant undertook to furnish power, and, having to this extent ratified the contract, no showing of previous authority was necessary.

II.   A witness was permitted to testify that Friechman was defendant's manager, and that he signed letters and acted as such in the Council Bluffs office. There was

2. AGENCY: evidence.

no error here. In this State a witness who has shown some competency is allowed to state that another is an agent. *Gualt v. Sickles,* 85 Iowa, 266; *Heusinkveld v. Insurance Co.,* 106 Iowa, 229; *Fritz v. Chicago Co.,* 136 Iowa, 699.

Even were there no other testimony, defendant's recognition of the contract made by Friechman, whatever it may have been, was sufficient proof of his agency and of

3. SAME.

his authority to make the contract. *Dowagiac Co. v. Watson,* 90 Minn. 100 (95 N. W. 885); *Geiser v. Yost,* 90 Minn. 47 (95 N. W. 584); *Bradford v. Smith,* 123 Iowa, 41.

III.   During the time the parties were trying to make the motor work, it was detached from the building where it was placed, and taken to the power plant in Omaha,

4. BREACH OF CONTRACT: evidence: result of experiment.

and there connected with wires from the Omaha station, and given what is known as the "brake test." This was done for the purpose of discovering whether or not there was any defect in the motor. This test disclosed that the motor was not at fault, and that, when a current of from two hundred to two hundred and thirty volts was supplied to each leg of the motor, it would do the work and furnish the necessary power. The results of this test were, over defendant's objections, given in evidence to the jury, and of this defendant complains. Bearing in mind the purpose for which this testimony was adduced, there was no error. Defendant was claiming that the trouble was with the motor, in that it was not adapted to the monocyclic current.

It was taken to the Omaha plant to see if the fault was
with the motor, and it was connected up with the same
current which defendant was furnishing on the Council
Bluffs side.   The voltage and amperage were the same
which defendant claimed it was furnishing at the building
for which it was designed, and the current was furnished
by the same generator.   The test was made to discover if
there were any defects in the motor itself, and for this
purpose we think the results thereof were admissible in
evidence.   The testimony shows that for all practical pur-
poses the conditions were the same as when the motor was
installed at Council Bluffs.   It was within the discretion
of the court to admit the results of this test.   *Homan v.
County,* 98 Iowa, 692; *Burg v. Railroad,* 90 Iowa, 106;
*Nosler v. Railroad,* 73 Iowa, 268.

IV.   Defendant sought to prove by an electrical en-
gineer the difficulty of using a monocyclic system in con-
nection with a regular three-phase motor to carry a load

5. SAME: evidence.   of six thousand pounds, and as to the gen-
eral inadaptability of the monocyclic cur-
rent to a three-phase motor; but plaintiff's objections to
such testimony were sustained.   In view of the issues ten-
dered by the answer and of the claimed result of the test
made in Omaha, we think this testimony should have been
received.

V.   The trial court gave the following among other
instructions:

It is conceded that there are three legs in a mono-
cyclic system.   The plaintiff claims that the defendant
company, through its manager in Council Bluffs, promised

6. INSTRUCTIONS: law of the case.   and agreed that it would furnish a current
of two hundred and thirty volts in each of
the three legs of its system, and the plaintiff
must prove such promise and agreement substantially as
alleged.   It will not be sufficient upon this point if it
merely appear that the defendant promised and agreed

that it would furnish a current of electricity. Nor will it be sufficient if it but appear that said manager represented that the defendant company had sufficient current to operate said motor, but it must appear that he promised and agreed to furnish a current of a voltage of two hundred and thirty volts in each of the three legs of the system. And, unless this is established by the greater weight of evidence, the plaintiff can not recover. Unless the contract alleged by plaintiff has been established by the greater weight of the evidence before you, the defendant was under obligation only to furnish such current as could be reasonably furnished by such monocyclic system, and, if you find that the damage, if any, occasioned to the Groneweg & Schoentgen Company, was because the current furnished by the defendant was not adapted to the motor which was installed in the building in question, this would not entitle plaintiff to a recovery, even though another kind of current under another system might have accomplished the purpose and caused said motor to operate. If you find from the evidence that the defendant did promise and agree, through its manager at Council Bluffs, to furnish a current of two hundred and thirty volts in each of the three legs of the system substantially as alleged in the petition, then you should proceed to a determination of the next question of fact submitted to you, but unless you do so find, then your verdict should be for the defendant without proceeding further.

These instructions, whether right or wrong, were the law of the case, and the jury was bound to follow them.

Appellant's counsel contend that thereunder there should have been a verdict for it, in that there was no testimony in support of the proposition that defendant expressly agreed to furnish a current of two hundred and thirty volts in each of the three legs of its system. Counsel overlook the testimony of one witness to the effect that defendant's manager represented that it had and could furnish voltage of two hundred and thirty throughout—in each leg. There was also some other testimony from which a jury may

7. BREACH OF CONTRACT: evidence.

have found that this was the agreement to be implied·
from what was in fact said. The instructions were very
favorable to defendant, perhaps more so than it was en-
titled to; but, treating them as the law of the case, we
think there was enough testimony to justify a finding for
plaintiff thereunder.

VI. The instruction given by the trial court with ref-
erence to the measure of damages reads as follows:

If plaintiff is entitled to recover, the measure of his
recovery will be the difference between what would have
been the reasonable rental value of said warehouse had
said electric current been supplied by the defendant ac-
cording to the terms of said contract, and what its reason-
able rental value was in the manner in which said electric
current was in fact supplied by the defendant company,
as far as shown by the evidence in this case. In com-
puting such rental value, you should begin with the date
on which said motor and elevator were fully installed and
the power of the defendant turned on, and estimate the
same from such date up to the time when the defendant
company furnished the power provided for under the terms
of said contract or sufficient power to operate said elevator
to its rated capacity of 6,000 pounds. It is the duty of
one who is damaged by the fault or neglect of another to
use all reasonable means, within his power, to lessen the
amount of his damage, and, if he have the means within
his power and fail to use the same to thus lessen the dam-.
age, he can not recover for such damages as he could by·
such means have averted or lessened. And in this case,
even though you may find that the defendant contracted
to furnish a certain amount of power, and you find that
it failed to comply with the terms of its contract, if you
further find from the evidence that the Groneweg. &
Schoentgen Company, through its officers, had knowledge
of some device which could have been installed at reason-
able expense, and by which said elevator could have been
operated with the power furnished by the defendant com-
pany, then it was the duty of the said Groneweg & Schoent-
gen Company to have installed such device, and if they
had such knowledge and failed to install the same within

a reasonable time, after having learned of the failure of the defendant to furnish such power under the contract, then the plaintiff can not recover for such damages as were occasioned after such reasonable time had elapsed within which to install such devise. The amount of plaintiff's recovery can not exceed $1,799; such being the amount claimed in the petition. The parties will be presumed to have had knowledge of such devices as were in general use at the time, and which were in such general use as that persons engaged in such business ought, in the exercise of ordinary prudence, to have known of. The Groneweg & Schoentgen Company would not be required to resort to experiments in obtaining and putting in use any device or devices to thus lessen any damages by reason of the defendant's failure to comply with its contract, but they would only be required to use such device or devices as were known to them to be practical or which ought to have been so known to them had they exercised ordinary prudence and foresight in endeavoring to ascertain thereof, and such device or devices as could have been installed at reasonable cost, and which would have enabled the elevator to be operated with the power thus furnished by the defendant company. There was some evidence tending to show that the said Groneweg & Schoentgen Company installed a 7½ horse power direct-current motor, and for some time operated the elevator to some extent. The said Groneweg & Schoentgen Company, it appears, adopted this means to enable them to operate the said elevator during a time when the motor in question failed to operate it, and they had a right to do so to lessen the damages which might be occasioned by reason of the defendant's failure to furnish power. And, if the plaintiff is entitled to recover in this action, you will also allow as part of the damages the reasonable rental value of the use of said direct-current motor during the time the same was so operated. In estimating the rental value of said building during such time as said direct motor was operated, you will take into consideration the amount, if any, which such reasonable rental value was enhanced by reason of the operation of said elevator by such direct motor during such time as it was so operated.

It is strenuously insisted that these instructions are

erroneous, in that they announce an incorrect rule for the assessment of damages.   Upon no other branch of the law is there so much difficulty as with the proper measure of damages.   There seem to be no fixed and settled rules for such cases.   Damages are awarded by way of compensation to make the party who suffers from tort or breach of contract whole, and in cases of breach of contract they are such as arise in the natural course of things, or such as may reasonably be supposed to have been contemplated by the parties when making the contract as the probable result of its breach.   It is also a general rule that a party injured by reason of a breach of contract must make reasonable exertions to render the injury as light as possible, and he can not recover for any loss which he might have avoided with ordinary care and reasonable expense.   Assuming then, as we must, that the defendant did not furnish the kind of current that it agreed to, we have to decide what is fair compensation to the plaintiff by reason of this breach of contract, and, if it be the rental value or the diminished rental value of the building, for how long may this continue.

8. BREACH OF
CONTRACT:
damages:
recovery.

The contract in this case was made in the year 1902, and defendant did not change its system to the regular three-phase until 1905.   Whilst the evidence is not very clear upon the subject, it appears that the defendant was attempting to make the motor work, changing its parts and connections, its wires, etc., until about the middle of February, 1903, when all further attempts in this direction were abandoned; but from that time on until the change made by defendant in its system the Groneweg Company received and paid for the current defendant was able to supply and used the motor and elevator as they could without any attempt to change or replace the same.   The change of current was made in the fall of 1905, but this was not for

9. SAME: con-
tract for elec-
trical power:
breach:
damages.

the special benefit of the Groneweg Company, nor was it induced to continue the use of the motor for these two years by reason of any promise on the part of the defendant. The evidence tended to show that the elevator was necessary to the full and complete use of the building, that the Groneweg & Schoentgen Company could not obtain a satisfactory electric current from any other source to run the motor, and that until the spring of the year 1903 the defendant was making every effort it could to supply the current it had agreed to furnish without avail. Until it ceased its attempts to furnish the agreed current and fully abandoned its efforts in this direction, it is clear that under the rule adopted in *Brownell v. Chapman,* 84 Iowa, 504, plaintiff, as the assignee of the Groneweg Company, was entitled to the difference in the rental value of the building with the current furnished as agreed and what it was reasonably worth with the current which defendant did in fact supply, unless the jury might have found that at ordinary trouble and for a not unreasonable expense plaintiff, or its assignor, might, by supplying a clutch or other device, have remedied the difficulty. In so far as the instructions are in line with this thought, they are correct.

But it will be observed that thereunder the jury was allowed to apply the same rule for the entire period covering more than two years during which defendant failed to furnish the agreed current, although it abandoned any attempt to do so in the spring of 1903, and plaintiff and his assignor, knowing of that fact, concluded to accept and pay for such current as was supplied without any complaint, and without effort to change the system by installing a new motor or any other form of motive power. Defendant, as we have said, did not promise to, nor did it, change its system in order to comply with its contract with plaintiff or its assignor. On the contrary it made every effort to adapt its current to the motor installed in the building until the spring of 1903, when it ceased any further effort

in this direction, delivered such current as it had, which plaintiff, or its assignor, accepted and paid for without objection or protest.

The rule of compensatory damages surely does not go to the extent contended for by appellee. Neither plaintiff nor its assignor could, after defendant had ceased its efforts to supply the current agreed upon, allow its building to remain vacant and unoccupied and collect rent for an indefinite time in the future because defendant did not and could not furnish the electrical current promised. If this were the rule, one who undertook to heat a large building at a given temperature, and who failed to make his appliance work, might be held for the rental value of that building, at least during the winter months, for an indefinite time in the future, limited only by the natural life of the building or of the plant to be installed. It is well known, of course, that there are many kinds of power for the running of elevators, both freight and passenger. Hydraulic, water, steam and gasoline are well-known systems for the running of elevators, and, when defendant abandoned its attempts to run the motor which had been designed for the movement of the elevator, plaintiff, or its assignor, could not sit idly by, and say: "We will charge to defendant the rent of this building until such time as it supplies the current it agreed to furnish." When the attempt to run the motor was abandoned, it was the duty of plaintiff, or its assignor, to accept what was being furnished as sufficient and adequate or to change its motive power by installing some other system which would operate the elevator to its satisfaction. Any other rule would make a vendor of heat, light or power responsible for the rent of buildings for an indefinite and almost unlimited future time. Of course, whatever expense the owner of the building was put to after the abandonment of the contract by the vendor of the power in order to secure the full enjoyment and use of the elevator by change of system, installation of new

mechanism, substitution of motors, loss of time, etc., should be charged to the party in fault; but not the rental value for the entire term when neither was doing anything to cure the difficulties. This rule furnishes adequate compensation, and is not unreasonable or punitive. The one announced by the trial court in so far as it allowed for difference in rental value after the spring of the year 1903 was more than compensatory, and was not within the contemplation of the parties at the time the contract was made. It may be that as neither plaintiff nor its assignor did anything toward changing the system for operating its elevator after defendant abandoned its effort to furnish a current which would start the motor when the elevator was loaded to capacity, but accepted and paid for such current as was furnished, that from that time on plaintiff should be limited in its recovery to such damages based upon differences in rental value as occurred before that time. This question is not argued, and we do not make any definite pronouncement upon the matter at this time. At most, plaintiff and its assignor could not recover differences in rental value after defendant had ceased its efforts to supply the current agreed upon for more than that reasonable time thereafter which was necessary to change the system in order to get the amount of power required. Charging to defendant this difference in rental values and the expenses of making the change will make plaintiff whole and furnish complete compensation, while allowance of difference in rentals for all future time would amount to a penalty imposed upon defendant for its failure to furnish a certain kind of electrical current as agreed. Defendant could not go upon plaintiff's premises for the purpose of changing motors or supplying the motor then installed with a clutch or other device to aid in starting the machine. These matters were within the exclusive control of the plaintiff or its assignor, and they were bound to so

use their property as to save defendant from damages for the breach of its contract.

There are not many cases similar to this, but such as we have been able to find lend support to the views expressed. Thus in *Cable v. Leeds,* 6 La. Ann. 293, where a mechanic undertook to make and deliver a crank to a steamer as soon as possible, he was held liable only for damages due to the detention of the steamer during the time actually necessary to obtain a suitable crank after a reasonable period had elapsed for the performance of his agreement. See, also, *Brown v. Foster,* 51 Pa. 165. So where a person purchased of a manufacturer a planing machine selecting it with reference to its weight and finish, the agreement being that he was to have the identical machine he had selected, and erected a building and prepared it at a large expense for the especial purpose of accommodating such machine, and the manufacturer refused to send him the machine purchased, having notice of the preparation therefor, by reason of which some time was lost before a machine could be put in operation, the purchaser was allowed to show in an action for the breach what would have been a fair rent for the use of the building and machinery if in running order during the time they lay idle in consequence of the refusal to deliver the machine, not to exceed, however, a period reasonably necessary for supplying another machine of similar character after being advised of the vendor's refusal to send the machine purchased. *Benton v. Fay,* 64 Ill. 417. This is merely following the general rule that a purchaser claiming damages can recover no more than it would cost him, with reasonable diligence, to supply himself by resort to the market or other source or means of supply. *Berkey & G. Co. v. Hascall,* 123 Ind. 502 (24 N. E. 336, 8 L. R. A. 65); *Beymer v. McBride,* 37 Iowa, 117. Stated in another way, it is the duty of the purchaser to protect himself from damages by reason of defective or dilatory

work if he can do so at a moderate expense or by ordinary and reasonable efforts. *Laporte Imp. Co. v. Brock,* 99 Iowa, 489; *Mather v. Butler Co.,* 28 Iowa, 259. These conclusions also have support in *Graves v. Glass,* 86 Iowa, 261; *Nye v. Alcohol Works,* 51 Iowa, 129; *Russell v. Giblin,* 16 Daly, 258 (10 N. Y. Supp. 315), and *Martin v. Seaboard,* 70 S. C. 8 (48 S. E. 616).

In instructing the jury that it might allow plaintiff the difference in the rental value of the building with and without the current agreed upon during the entire time from 1902 to 1905, when defendant changed its system, we think the trial court was in error. Plaintiff was entitled only to this difference for the time that defendant was endeavoring to comply with its contract, and for such reasonable time thereafter as would have enabled the Groneweg Company to have substituted some other known and approved motive power for the running of its elevator. This is the most it would be entitled to under any circumstances. Whether or not it should have supplied the motor with the clutch or other device to enable it to be started before that time was a fair question for a jury. If, in the exercise of reasonable care and prudence at moderate or small expense, it could have remedied the difficulty, it should have taken that course, and, if a jury should find that this was the proper course to have been pursued, the plaintiff would not have been entitled to the rental value of the building after it became the duty of the Groneweg Company to remedy the defect. As already intimated, this question of the measure of damages is always difficult, and many times incapable of satisfactory solution. Adequate compensation for the loss incurred is the result aimed at; and nothing uncertain or speculative is to be awarded. Moreover, it is the duty of the purchaser to use reasonable efforts and to go to any moderate and reasonable expense to save himself from the consequences of a breach of contract. He can not sit idly by and charge everything

to the party at fault.  Nor can he fold his hands and hold the other party liable for the rent of his building for an indefinite period.  We have examined all the cases cited by appellee's counsel, and find none which run counter to the views herein expressed.

On account of the errors pointed out, the judgment must be, and it is, *reversed*.