# MINNETONKA OIL CO. v. CLEVELAND VITRIFIED BRICK CO.

No. 2212.   Opinion Filed September 13, 1910.

(111 Pac. 326.)

1.   EQUITY—Jurisdiction—Multiplicity of Suits. The rule that the prevention of a multiplicity of suits is a ground for equitable jurisdiction applies where one party may be required to sue several times in relation to the same subject-matter in its entirety, or in respect to some element thereof, or where to secure proper redress of the continuous breach of a contract by the other party a great number of suits at law for damages growing out of such breach may be necessitated.

2.   CORPORATIONS—Officers—Acts Within Apparent Authority. Where one of the purposes for which a corporation is organized under the laws of Pennsylvania is the furnishing of gas for fuel and light purposes, and all of its directors reside in said state, with the exception of one, who resides in Oklahoma, where the corporation has its plant, and who, having practically the sole management of its business in the latter state and having at different times made various contracts for the supplying of gas at different prices, as general manager and having executed a contract in the name of said corporation, in connection with its president, obligating said corporation to furnish gas for a certain period free, and thereafter for an additional period at a designated price; it further appearing that said concession in the supplying of free gas and the price of the other gas to be furnished was made in order to induce a brick manufacturing concern to establish a brick plant in the town where the gas company was located; and further, under the terms of said contract, after the establishment and beginning of the operation of said brick plant, said gas company furnished to said brick company gas free for a period of six months, said contract not being questioned—held, that said officers acted within the apparent scope of their authority, and the finding of the court that the gas corporation was bound by said contract is without error.

3.   ESTOPPEL—Contracts—Rescission—Grounds. The contract requiring the brick company to erect a brick plant within one mile of a depot in a certain place, at the time the contract was entered into the general manager of the gas company having designated the point where the same should be located, it being assumed by all parties that such point was within one mile of said depot, and thereafter said plant having been constructed at such

designated point, in all other respects complying with the contract, the gas company will be estopped from thereafter setting up that said plant was not located within the prescribed limits.

(a) The contract further providing that the brick plant when completed and ready for operation shall be of such extent and capacity as to regularly and permanently employ not less than 25 adult employees in the conduct of its manufacturing operations, and that if at any time the brick plant should be found operating its plant with less than 25 bona fide adult employees, then the gas company may charge 3 cents per 1,000 cubic feet for gas used and not be held to furnish the same free until said brick plant should have at least the full number of adult employees on its pay roll, is not ground for the rescinding of such contract, but upon the happening of such contingency entitles the gas company to collect for the gas supplied at the price named.

4.    **ASSIGNMENTS—Contracts Assignable.** A contract, providing that H. shall erect and complete a brick plant at a designated point near the city of C., commencing within a certain time and completing it with reasonable dispatch, of such capacity as to afford bona fide employment to 25 adult employees, and as consideration therefor M. Company shall furnish gas for both fuel and light purposes for said plant for a certain period free, the meter and gas pipe lines to be installed at the expense of H., and thereafter for a certain period at a stipulated price and also for the employees and their families at a certain stipulated price, during a certain period, all except the free gas to be paid for monthly and the latter in advance by the brick plant, H. to be reimbursed for the outlay for the meter and pipe line when the period began for paying for the gas for the brick plant, the plant having been installed and operated in accordance with the contract for a period of six months, the M. Company then notifying H. that said contract was rescinded, he having sold said plant and assigned said contract to C. Company, not receiving said notice until after the sale and assignment to C. Company, when he notified said M. Company of said sale and assignment, M. Company receiving knowledge of said sale and assignment again notified both H. and C. Company that said contract should be considered as rescinded, not intimating or indicating that it considered said contract to be nonassignable,— Held, that when the contract is considered on its face, in connection with the contemporaneous construction placed upon it by the parties and their actions thereunder, it was assignable.

(Syllabus by the Court.)

*Error from District' Court, Pawnee County; Bayard T. Hainer, Judge.*

Action by the Cleveland Vitrified Brick Company against the Minnetonka Oil Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*E. M. Clark* and *Fred S. Liscum,* for plaintiff in error.

*Flynn, Ames & Chambers,* for defendant in error.—On question of equitable jurisdiction: *Xenia Real Estate Co. v. Macy* (Ind.) 47 N. E. 147; *School Dist. v. Ohio Gas. Co.* (Pa.) 25 Atl. 868; *Graves v. Gas. Co.* (Iowa) 50 N. W. 283; *Williams v. Neely,* 134 Fed. 1. On assignability of contract: *Am. Bonding & Trust Co. v. Railroad Co.,* 124 Fed. 866; *Edmonds v. Railroad Co.,* 80 Fed. 78; *Horst v. Roehm,* 84 Fed. 565; *Larne v. Goezinger* (Cal.) 24 Pac. 42; *Leader Printing Co. v. Lowery,* 9 Okla. 89.

WILLIAMS, J. The following questions are raised by the plaintiff in error in this case: (1) That injunction is not the proper remedy; (2) that the parties executing the contract on the part of the plaintiff in error, a corporation, did not act within the scope of their authority; (3) that the contract had not been complied with by the Hammar Brick Company before the same was assigned to the defendant in error; (4) that the contract was not assignable.

1. The aid of equity may be invoked to stay a wrong, when relief at law would occasion a multiplicity of suits. In *Johnson et al. v. Swanke,* 128 Wis. 68, 107 N. W. 481, 8 Am. & Eng. Ann. Cas. 544, this rule is stated that the prevention of a multiplicity of suits as a ground for equitable jurisdiction applies where one party may be sued several times in relation to the same subject-matter in its entirety, or in respect to some element or elements thereof. See, also, *Threlkeld v. Steward et al.,* 24 Okla. 462, 103 Pac. 630. The ultimate criterion is in the utter inadequacy of the legal remedy. With said contract rescinded, the gas bills for both fuel and light would have to be paid monthly, running over a period of years, necessitating the plaintiffs bringing a multiplicity of suits to recover the money paid therefor as to the time the gas was to be furnished free, and the excess for the period it was.

to be supplied at a reduced price. Other cases have been cited by defendant in error, wherein manufacturing plants have successfully invoked the aid of equity in enjoining gas companies from cutting off the gas under a contract to supply same for fuel and light purposes. In those cases the proof showed that the manufacturing plants could not reasonably secure or procure gas for fuel and light from other sources, and the decisions in such cases seem to be based on that point. In the case at bar, it appears from the record that the plaintiff in error demanded, as a condition precedent, that the defendant in error should acquiesce in the canceling of the contract in order to have gas furnished the brick plant for fuel and light purposes, and under such circumstances gas would not have been reasonably available from the plaintiff in error. But there is evidence in the record tending to show that there were other gas companies operating in and near Cleveland from which gas was available to the defendant in error; but, as before stated, it is not necessary to determine whether an injunction was the proper remedy on this theory, for it is clearly invokable to prevent a multiplicity of suits to redress, you might say, monthly breaches of a contract extending over a period of years.

2. This contract, on its face, is within the scope of the power of the corporation, and it is presumed so to be. *Ohio & Mississippi Ry. Co. v. McCarthy,* 96 U. S. 258-268, 24 L. Ed. 693. It is executed in the name of the corporation by P. O. Laughner, its president, and J. E. Schell, its manager. The proof shows that all the directors of said corporation, except Schell, resided in the state of Pennsylvania, he remaining the most of the time in Oklahoma and having practically the entire management of said corporation, making contracts for the sale and supplying of gas at different prices in accordance with the amount consumed. Said officer, in the name of plaintiff in error, had made various contracts at different prices for supplying gas, among which was the contract involved in this controversy. Under said contract gas had been furnished extending over a continuous period of

about six months, from about the 1st of May, 1905, until about the 1st of December, 1905, the time said notice was served on the officers of the plaintiff. The court found that at the time the officers of said corporation executed said contract they were acting within the apparent scope of their authority, and that they had the authority to execute the same and to bind the defendant. The evidence reasonably tends to support such finding. There appears to be no error in this action of the court. *Jack v. National Bank of Wichita*, 17 Okla. 430, 89 Pac. 219; *Curtis Land & Loan Co. v. Interior Land Co.*, 137 Wis. 341, 118 N. W. 853; *Kimbal Bros. Co. v. Citizens' Gas & Electric Co.*, 141 Iowa, 632, 118 N. W. 891; Cook on Corporations, § 725, pp. 2350-2360.

3. The court found that said George F. Hammar in all respects complied with the terms and conditions of said contract. The record shows that the plant was located at a point agreed upon by J. E. Schell, the general manager of the gas company, at the time the contract was entered into; that said plant was built thereon and operated by the Hammar Brick Company, the gas being supplied by the company in accordance with said contract, there never being any contention made prior to the time the notice to rescind said contract was served on the plaintiff, or its assignor, that said plant was not located in accordance with the terms of the contract, and that said contract had not been complied with. Further, as to the point that the Hammar Brick Company did not at all times employ twenty-five men in the operation of said brick plant, the contract stipulated "that if, at any time, the said plant be found in operation with less than twenty-five *bona-fide* adult employees, then said oil company may charge three cents per thousand cubic feet for gas used and not to be held to furnish the same free until said brick company shall have at least the full number of twenty-five adult employees on its pay roll." Conceding that at all times said number of men were not employed, yet that would not entitle the defendant to terminate the contract. Suffice it to say that the court found that the said George F. Hammar in all respects complied with

the terms and conditions of said contract. Such finding being reasonably supported by the evidence, we will not disturb the same.

4. The more serious question in this record to determine is whether the contract was assignable. At common law no chose in action was assignable. In equity, however, every chose in action, except a tort, was assignable, but subject to all equities that might be set up against it. *McCrum v. Corby*, 11 Kan. 467 (2d Ed. 353); *Kansas Midland Ry. Co. v. Brehm*, 54 Kan. 751, 39 Pac. 690; *Barringer v. Bes Line Constr. Co.*, 23 Okla. 131, 99 Pac. 776; *Glenn v. Marbury*, 145 U. S. 499, 12 Sup. Ct. 914, 36 L. Ed. 790. Under our statute, every chose in action, not founded upon a tort, is assignable, and right of action is conferred upon the assignee. See section 4224, Wilson's Rev. & Ann. St. 1903; St. Okla. T. 1893, § 3898; *K. C., M. & O. Ry. Co. v. Shutt*, 24 Okla. 96, 104 Pac. 51.

In *La Rue v. Groezinger*, 84 Cal. 281, 24 Pac. 42, 18 Am. St. Rep. 179, the defendant and one H. entered into a contract, whereby the latter agreed to sell to the defendant all the grapes which he might raise during a period of ten years in a certain vineyard. The grapes were to be sound, and to contain 22 per cent. of saccharine matter, and to be delivered in boxes. The crop for a certain year was tendered by the plaintiff, and the defendant refused to accept same upon the ground that there was no contract. The crop was resold at a sacrifice. The court said:

"* * * If the contract itself provides in terms that it is not transferable, it certainly cannot be transferred, although it otherwise might be so. Leases, and the tickets usually issued by railroad companies, are familiar instances of this. Upon the same principle, although a contract may not expressly say that it is not transferable, yet, if there are equivalent expressions, or language which excludes the idea of performance by another, it is not assignable. Of this character is the case of *Shultz v. Johnson*, 5 B. Mon. [Ky.] 497, which is much relied on by the appellant. There the defendant agreed to buy from one Johnson successive crops of 'hemp of his own raising,' and it was held that the defendant could not be compelled to accept hemp raised by

Johnson's administrator. The court said that 'the question * * * in every case must turn at last upon the intention of the parties,' and that the phrase 'of his own raising' meant that the hemp was to be raised by him or under his personal superintendence and direction. Upon the same principle, it would probably be held that if the contract provided that it was not to be assigned to a particular person, it could not be assigned to such person; and it would seem, from one of the cases cited by the appellant, that if an intention not to deal with a particular person appears from circumstances outside of the contract, it cannot be assigned to such person. In the case referred to the plaintiff had previously been supplying the defendant with ice; but the latter had become dissatisfied, and had transferred his custom to a company called the Citizens' Ice Company, and had made a contract with it. After this the plaintiff bought out the Citizens' Ice Company, and, without letting the defendant know of the transfer, went on supplying him with ice. When the defendant found out what had been done, he refused to pay for the ice; and the court held that he was not liable, although he had consumed the ice, and had no fault to find with it. *Ice. Co. v. Potter*, 123 Mass. 30 [25 Am. Rep. 9]. We think that this case may be distinguished from the one before us on the ground of the extraneous circumstances showing the defendant's intention not to deal with the plaintiff. If it cannot be so distinguished, we should be inclined to question the soundness of the decision. In the next place, although the language may not show an intention that the contract should not be assigned, yet the nature of the case may be such that performance by another would be an essentially different thing from that contracted for. Thus, a picture by one artist is an essentially different thing from a picture on the subject by another artist; and so of a book composed by an author, or by any other act or thing where the skill, credit, or other personal quality or circumstance of the party is a distinctive characteristic of the thing contracted for, or a material inducement to the contract. Under this general head come several cases relied upon for the appellant. Thus, in *Lansden v. McCarthy*, 45 Mo. 106, it was held that a contract to deliver meat to a hotel, to be paid for at the end of each month, could not be assigned by the hotel keeper; the court saying: 'The defendant's estimate of the solvency and pecuniary credit and standing of the plaintiff's assignors may have constituted an important inducement of the con-

tract, without which he never would have entered into it.' So, in *Arkansas Val. Smelter Co. v. Belden Min. Co.*, 127 U. S. 388, 8 Sup. Ct. 1308 [32 L. Ed. 246], 'it was held that a contract to sell ore to the smelting company, the price of which was to be adjusted and paid for by the mutual acts of the parties after delivery, was not assignable by the smelting company; the court, per Gray, J., saying: 'During the time that must elapse between the delivery of the ore, and the ascertainment and payment of the price, the defendant had no security for its payment except in the character and solvency' of the smelting company. If, therefore, the case before us comes within either of the qualifications above stated, then it must be conceded that the contract was not assignable. But if it does not—that is to say, if the language does not exclude the idea of performance by another, and the nature of the thing contracted for, or the circumstances of the case do not show that the skill, credit, or other personal quality or circumstances of the party was a distinctive characteristic of the thing stipulated for, or a material inducement to the contract—then the contract was assignable under the provisions above quoted. It is obvious, therefore, that in this state, at least, the question whether a contract is assignable is a question of construction. As was said in the Kentucky case above referred to, 'the question * * * in every case must turn at last upon the 'intention of the parties.' "

The case of *Sargent Glass Co. v. Matthews Land Co.*, 35 Ind. App. 45, 72 N. E. 474, is cited by plaintiff in error as supporting its contention that the contract was not assignable. On the contrary, by a careful perusal of that opinion, we find that there was a supplemental contract, which the court held to be binding, and on the back of which it was stipulated that the contract was not transferable. Therefore that case can in no wise be considered here as in point.

In *Tifton, T. & G. Ry. Co. v. Bedgood*, 116 Ga. 945, 43 S. E. 257, also cited by plaintiff in error, it appears that Huber & Stokes owned the timber suitable for sawmill purposes on certain lots of land aggregating 1,617 acres, and had entered into a contract with the railway company, wherein it agreed to put in a sidetrack to the sawmill of Huber & Stokes, located on the land upon which said timber was located; that afterwards the said Huber

& Stokes transferred all their right, title and interest in said timber, and also the contract with the railroad company, to R. A. Bedgood, who afterwards sold and transferred said timber to R. A. Bedgood & Co., and also assigned the contract from the railway company wherein it obligated itself to construct said side track. This was not an executed contract as to any party thereto, and is, accordingly, distinguishable from the one at bar.

The case of *Arkansas Smelting Works v. Belden Mining Co.,* 137 U. S. 389, 8 Sup. Ct. 1308, 32 L. Ed. 246, is cited also by plaintiff in error as in point; but it is distinguishable from the case under consideration. The contract there sued on was one by which the defendant agreed to deliver 10,000 tons of lead ore from its mines to Billing & Eilers at their smelting works. The ore was to be delivered at the rate of fifty tons per day, and it was expressly agreed that it should become the property of Billing & Eilers as soon as delivered. The price was not fixed by the contract or payable upon delivery of the ore, but as often as every hundred tons of ore had been delivered, the same was to be assayed by the parties, or one of them, and, if they could not agree, by an umpire; and it was only after this had been done, and according to the result of the assay and the proportions of lead, silver, silica and iron thereby proved to be in the ore, that the price was to be ascertained and paid. During the time that must elapse between the delivery of the ore and the ascertainment and payment of the price, there was reposed a confidence as to assaying, preserving the ore, etc. The defendant, therefore, could not be compelled to accept any other person or corporation as a substitute for those with whom it had contracted, when it embraced matters of personal trust and skill in the retaining, preserving and assaying of the ore.

In *Wooster v. Crane et al.,* 73 N. J. Eq. 25, 66 Atl. 1094, also cited by plaintiff in error, the court of chancery said:

"Now, if we turn to the contracts here in question, we find that they provide for the publication of certain school books, by

the defendant on certain terms, among which is that the contracts extend during the life of the copyright not yet expired and of any renewal thereof, and that the defendant is to keep an account of the sales and render such account every six months during that period, and to pay the complainant a certain percentage of the sales every six months. Here, then, comes in directly the question of pecuniary responsibility."

It was held in that case that such a contract was not assignable. We agree with the rules therein illustrated that if A. agrees to deliver to B. at a certain point a certain quantity of any commodity at a certain price at stated times in the future, and to take B.'s promissory note at three months for the price, manifestly B. cannot assign that contract to C., and compel A. to take C.'s promissory note instead of B.'s for which he had contracted; B. thereby being released from all liability.

In the case at bar Hammar, by his assignment, is not released from liability. If his assignee, the brick company, should fail to carry out his undertaking to pay for the gas consumed, he would be liable therefor. The case of *Liberty Wall Paper Co. v. Stoner Wall Paper Mfg. Co.,* 59 App. Div. 353, 69 N. Y. Supp. 355 (affirmed without opinion in 170 N. Y. 582, 63 N. E. 1119), is in point. The Liberty Wall Paper Company contracted to sell one Stoner paper to the amount of between $25,000 and $50,000; he agreeing to purchase same and to pay all bills therefor within thirty days after the date of shipment. Thereafter Stoner and others organized the Stoner Wall Paper Manufacturing Company; he verbally assigning his contract with the Liberty Wall Paper Company to the Stoner Wall Paper Manufacturing Company. Beginning at the bottom of page 358 of 69 N. Y. Supp., page 358 of 59 App. Div., the court said:

"The contract is not a personal one, in the sense that Stoner was bound to perform in person. Stoner had a right to assign the contract, or in case of his death his executors or administrators would have succeeded to his rights and liabilities under the contract. The obligations of Stoner under the contract could have been discharged by any one. If the assignment was made

without the consent of the plaintiff, the obligations of the contract would still have rested upon Stoner, and resort could have been had to him for the fulfillment of the contract if the same had not been carried out and discharged by his assignee."

In *Rochester Lantern Co. v. Stiles & Parker Press Co.*, 135 N. Y. 209, 31 N. E. 1018, one K. entered into a contract with the Stiles & Parker Press Company by which it agreed to make and deliver to him ties to be used in the manufacture of lanterns, in which business K. proposed to engage, but was not then engaged. It did not appear that he contemplated doing so until the ties were furnished. The Rochester Lantern Company was subsequently incorporated; K, assigning the contract to it. There had been at that time no breach thereof. In the opinion the court said:

"The contract was not purely personal in the sense that Kelly was bound to perform in person, as his only obligation was to pay for the ties when delivered, and that obligation could be discharged by any one. He could not, however, by the assignment absolve himself from all obligations under the contract. The obligations of the contract still rested upon him, and resort could still be made to him for the payment of the ties in case the assignee did not pay for them when tendered to it."

In *Poling v. Condon-Lane Boom & Lumber Co. et al.*, 55 W. Va. 529, 47 S. E. 279, the court said:

"The plaintiff contends that the contract in question was and is assignable, and supports his contention by the citation of numerous authorities. 2 Am. & Eng. Enc. Law (2d Ed.) 1035, says: 'As a general rule, in all cases where a contract is executory in its nature, and an executor or administrator would succeed to the rights and liabilities of a deceased party to the contract, the contract is assignable. * * * A contract in which the *delectus personae* is not material, and is an agreement for services which may be as well performed by one person as another, is assignable.' Contracts in which the *delectus personae* is material, as where a person agrees to use his personal skill and knowledge, and has been contracted with by reason of the trust and confidence placed in him, cannot be assigned by such person while the agreement remains executory, without the consent of the other contracting party. When the assignment of a contract is made, its obligations will still rest upon the assignor, who, in case of default on

the part of his assignee, must respond to the other party to the contract. 2. Am. & Eng. Enc. Law (2d Ed.) 1036. It will be observed that Pyle assigned and transferred to Poling, trustee, among other things, 'all money due said George Pyle, from the Condon-Lane Boom & Lumber Company by virtue of a contract between him and said company all that is now due and to become due by virtue of said contract and all other property not included.' No personal confidence or peculiar skill on the part of Pyle seems to have been contemplated or contracted for by said company, in this instance. We find no reason or authority for saying that the contract in question is not assignable; and could not be assigned to Poling, trustee, by Pyle, as alleged. We fail to see how appellant could be prejudiced by an assignment of the contract to Poling. It was required to pay no money until certain work was done, according to the very terms of the contract."

Hammar had erected the brick plant of the required capacity, at the point and within the time as agreed upon. He did not agree to operate it at all. His undertaking was to have it of a capacity to reasonably require the employment of twenty-five adult employees, and that, if he failed to have on the pay roll in good faith twenty-five adult employees, he was not to receive free gas, but must pay a stipulated price therefor. The gas for the brick plant, after the expiration of the three years in which free gas was to be furnished, was to be paid monthly. That for the employees and their families at a designated price was to be paid by it monthly in advance. There is nothing in this contract that indicates that any extra degree of personal trust is reposed in Hammar; no requirement from him to operate the plant for a number of years or for any stipulated time. It was doubtless recognized by the gas company that, if the investment in the brick plant was made, the plant having been erected and the machinery installed, should Hammar fail in operating it, it would necessarily be operated by others, as such an investment would not be permitted to be idle and unremunerative. It would be a violent presumption to conclude, under the facts in this record, that Hammar would have made such an investment and entered into this contract, when the effect would be that, if he should die, *eo in-*

*stante* the oil company would be released from supplying the brick plant with gas under its contract. The plant having been operated for months, gas being supplied free until about the middle of November, 1905, a notice was attempted to be served upon Hammar that said contract should be considered as rescinded and held for naught. That was before the gas company had any information of the assignment of the contract. After they received such knowledge, another notice was served both on Hammar and on the brick company, that the contract would be held for naught on certain grounds. But there is no indication or intimation in that notice of any contention that the contract was not assignable. It is raised for the first time in the pleadings in this case, and it is a very liberal construction of pleadings by which we reach the conclusion that at first the gas company intended to plead that the contract should be rescinded or avoided on the ground that it was non-assignable. We are permitted to look at the construction placed upon the contract by the parties thereto and their acts under it in carrying same into effect in determining what the intention of the parties was as to its assignability at the time it was entered into. *American Bonding & Trust Co. v. B. & O. S. W. R. Co.*, 124 Fed. 866, 60 C. C. A. 52, and authorities therein cited. The contract here was something more than an executory one. Hammar had executed the same so far as it applied to him. As a consideration for his undertaking, which he completed, the oil company had agreed to supply certain gas free for a time, and thereafter at a certain price. If a contract calling for a certain designated sum of money, for goods, or for a certain thing to be performed, can be assigned, why cannot a contract calling for certain gas be assigned? Gas may be a property chattel as much as any other kind of personalty. True, the contract stipulates that it shall be in force and effect for ten years unless it comes to an end by its own termination, which would be on account of the exhaustion of the gas field; but there is no further express covenant to be performed by the brick company, except to pay for the gas furnished after a certain date, the gas for its em-

ployees to be paid in advance. Hammar, the assignor, however, was liable for such sum or sums in the event the brick company failed to pay therefor.

The presumption is that, if a contract is to be non-assignable, the parties thereto will so expressly provide. Otherwise, the same is to be considered as assignable. When we consider this contract without any stipulation as to non-assignability in connection with the facts and circumstances surrounding the entering into of the same, the operation thereunder, and the action and declaration of the parties in seeking to rescind it, we are to determine whether such contract is assignable. Individual and commercial development have tended to sweep away the limitations of the ancient common law, not only as to entailments and restrictions as to land, but also as to contracts, and choses in action, with a view that whatever one owns cannot be rendered valueless as an asset in business and trade. When we consider the contract with no stipulation therein against its assignment, no covenant for the operation of this plant for any specified time, nothing indicating a requirement of any special skill, personal trust, or confidence on the part of Hammar, the only condition imposed other than the construction of the plant, and the location of the same, being a requirement that if the plant was operated with less than twenty-five employees, during the period that free gas was to be furnished, to wit, three years, such gas as was consumed should be paid for at a certain price, and at the beginning of the proceeding to annul the contract, no reference being made as to non-assignability, we reach the conclusion that it was not the intention of the parties, at the time of making the contract, that said contract should be non-assignable.

The judgment of the lower court is, accordingly, affirmed.

All the Justices concur.