# DUMAS *v.* CLAYTON.

FRAUDULENT CONVEYANCES; DEEDS OF TRUST; WITNESSES.

1. If the grantee in an alleged fraudulent conveyance, knowing of his grantor's fraudulent intent, accepts the transfer, not only to secure a debt due to himself from the grantor, but also to aid his grantor in the execution of a purpose to defraud his other creditors, the conveyance is void as to such other creditors.

2. Where the grantee in a deed of trust alleged to be fraudulent as to other creditors claims that the consideration therefor was the payment

of an existing indebtedness of $3,500 and a loan of $3,000, and it ap
pears that no such loan was made, the deed of trust is fraudulent and
void.

3. In a suit to set aside as fraudulent a deed of trust on all his real estate
made by a debtor during the short period which elapsed between the
announcement by the court of an opinion adverse to him and the en-
try of a personal decree against him, where it was claimed by the
beneficiary under the deed of trust that the consideration therefor
was the payment of an existing indebtedness of $3,500 and a loan of
$3,000, the testimony was reviewed and *held* insufficient to show that
the deed of trust was supported by the consideration named and the
decree setting it aside as fraudulent was affirmed.

4. Parties to an alleged fraudulent conveyance which is attacked by a
creditor, who are called as witnesses by the creditor, may, because
of their adverse interests, be treated as witnesses on cross-examina-
tion.

5. Where in a suit by a creditor to set aside a conveyance by his debtor
as fraudulent, the complainant places the debtor and transferee on
the stand to testify, he cannot impeach them in the ordinary manner
permitted in the case of witnesses called by the opposite party; but
he is in no wise concluded by their testimony, which will be given
such weight by the court as, under all the circumstances, it is enti-
tled to.

6. What favorable facts the party calling an adverse party to testify as
a witness obtains from him may be regarded as wrung from a reluc-
tant and unwilling person, while those which are unfavorable may be
treated by the jury with just that degree of belief which they may
think is deserved, considering their nature and the other circum-
stances of the case.

No. 1960. Submitted January 7, 1909. Decided March 2, 1909.

Hearing on an appeal by the defendant from a decree of the
Supreme Court of the District of Columbia sitting as a court of
equity, in a suit to set aside alleged fraudulent transfers.
*Affirmed.*

The Court in the opinion stated the facts as follows:

This is an appeal from a decree sustaining a creditors' bill to
set aside a conveyance as made to hinder, delay, and defraud
creditors.

The bill was filed by Ella M. Clayton against James L. Neill, Agnes M. Wickersham, Michel O. Dumas, William H. Beck, John W. Smith, L. Melendez King, and Thomas A. Johnson.

The allegations in substance are: That on April 12, 1905, in a suit begun by Ella M. Clayton against James L. Neill and one Albert, the supreme court of the District of Columbia rendered a decree against the said defendants for the sum of $400, besides costs of suit. That execution was issued thereon, and returned unsatisfied. That defendant Neill is insolvent and has no remaining property subject to execution. That at the time of the institution of plaintiff's said suit, and just before entry of decree therein, said Neill was seised and possessed of lot 32 in square 179, and lot 48 in square 360, as designated on the map of the city of Washington. That on April 3, 1905, said Neill conveyed lot 32 aforesaid to Beck and Smith in trust to secure a note for $600 executed on the same day by him to Agnes Wickersham. That on April 7, 1905, Neill conveyed both of said lots, subject to certain encumbrances, to King and Johnson as trustees to secure the payment of two notes executed by him on the same day, and payable [to Michel O. Dumas] one year after date, with 5 per cent interest; one of said notes being for $1,500 and the other for $5,000. That both of said conveyances were made with the intent to hinder, delay, and defraud complainant, and to prevent the collection of her debt. That said parties took said conveyances with knowledge of said intent; that the consideration for the same was fictitious in whole, or in great part; and that they colluded with said Neill in order to hinder, delay, and defraud plaintiff. Answer under oath was waived, but there was a prayer that defendants Neill, Wickersham, and Dumas be required to discover the real and exact consideration of said promissory notes, how much money had been advanced thereon, and for an accounting. There was a further prayer that the conveyances aforesaid be declared void, and that the said lots be sold in satisfaction of plaintiff's decree and costs.

Dumas answered denying the allegations of fraud, and alleging a full consideration paid for the notes and trust deed to secure the same to him, without stating the particulars. An inter-

locutory decree *pro confesso* was entered against the other defendants, who had been served with process and had failed to enter appearance, on October 5, 1906. On petition of Neill, Wickersham, Beck, and Smith, this decree was set aside as to them, on November 2. Thereafter Neill answered denying the charges of fraud. Beck, trustee,. answered alleging that Agnes Wickersham had lent $600 to Neill in good faith, through the Washington Title Insurance Company; that she had no knowledge of the pending suit by plaintiff against Neill, or of any fraudulent intent on his part; and that said note has been indorsed before maturity to Emma J. Smith, who holds the same for value without notice.

The evidence shows that Ella M. Clayton sued Neill on her demand November 14, 1903. That the cause was submitted to the court on March 16, 1905. That on March 27 the court announced his conclusions of fact and law in favor of plaintiff, and directed a decree to be prepared in accordance therewith. That counsel for Neill was present. That a decree awarding plaintiff $400 was prepared, agreed upon, and signed by the court on April 12, 1905. That execution had been promptly issued thereon, but was returned unsatisfied because no property of defendant Neill could be found. That the decree remains unsatisfied. Having proved the above facts, which were not contradicted, the plaintiff called Neill and Dumas for cross-examination, as stated. Neill testified to obtaining the loan of $600 from Wickersham, and the receipt of the full amount of money. Regarding the transaction with Dumas, he said that he owed Dumas $3,500 prior to April 7, 1905, and borrowed $3,000 more. That his notes for $3,500 were surrendered to him, and he executed the two notes for $1,500 and $5,000 respectively, together with the trust deed, and delivered the same to Dumas. That the conveyance was made with no intent to defraud plaintiff, and that he did not inform Dumas that a decree was about to be rendered against him in her favor. That the former loans from Dumas, unsecured, were generally of small sums, but ranged from $5 to $500 each. That Dumas gave him a check for the $3,000, which he cashed, and took the money home, where:

he kept it in his trunk. That he paid about $700 of the money to creditors, one of whom was Johnson, one of the trustees to secure Dumas. Dumas was represented by L. Mclendez King, to whom he said he would leave the matter. King was to look into the condition of the property. Dumas and witness were intimate friends. He said also that he did not recognize the Clay-ton claim as a legitimate debt, and therefore did not pay it, and does not intend to.

Dumas testified that he was a physician, and made from $3,500 to $4,000 per year. Kept his deposit with the Washington Loan & Trust Company. That he had property in Maryland worth $65,000. Subsequent examination developed that he was one of a syndicate which had purchased the land known as "Belmont," near Chevy Chase. Neill had been interested in the matter also. The price paid for the property was $50,000 subject to trusts aggregating $42,000 which were assumed. There is a third trust of $3,000, but the second trust, for $22,-000, has since been reduced to about $14,000. There was produced a declaration of trust executed by Dumas and Satterwhite, acknowledging that the purchase price of the holding was $50,-000, and that $2,250 has been paid in on the same as follows: Neill $400; Dumas $400; Cuney $4,300, and Satterwhite $1,-150; and declaring that they held the title in trust for the benefit of said parties according to their said payments. He further said that he had lent Neill in all $3,500 during a number of years before the last transaction, and had his unsecured notes aggregating that amount. That he had no knowledge of the intended decree against Neill, and entered into the transaction with him in good faith to secure his debt and the additional loan of $3,000. Surrendered the notes for the $3,500 when the new notes and trust deed were delivered. The property was sold under the trust in August, 1906, and purchased by him for $5,300. He then surrendered both notes to Neill. He produced some can-celed bank checks payable to Neill, commencing November 29, 1902. These were fourteen in number. The largest of those dated in 1902 was for $100, the smallest for $20. Three checks, from January 1 to May 22, 1903, aggregating $108.50. One

check dated March 28, 1905, was for $210; another April 4, 1905, was for $80. The fourteen checks aggregated $830. No other checks could be found. Dumas remembered having made deposits to his credit in the Loan & Trust Company, early in April, 1905, of $2,000 and $1,300, which he said he had received from his brother in Vicksburg, Mississippi, in payment of a debt. Had received the money by telegraph. He could not remember having deposited $3,000 or $3,010 in money about the same time. The bank account of Dumas was produced by the teller of the Loan & Trust Company, beginning July 19, 1902. This shows an average credit of about $2,700, reaching the amount of $3,201.76 on January 2, 1905. On April 1, 1905, the balance was $3,408.51; $2,000 were deposited April 7, raising the balance to $5,146.01. This was reduced by a check for $2,000 on April 8; $3,000 were drawn on April 8, reducing the balance to $146.01. April 8 there is a deposit of $3,010, raising the balance to $3,156.01; and on the 11th $1,300 were checked out. The check given to Neill on April 7, 1905, for $3,000 was produced. It bears the indorsement of Neill and that of L. Melendez King, and is marked paid April 8, 1905, which is the same day that the deposit was made of $3,010 in bank notes, as shown by the deposit slip. A conveyance by Neill to trustees on November 14, 1902, to secure a note to one Pairo for $2,000 in three years was read in evidence. This was outstanding on April 7, 1905. Two witnesses for plaintiff valued the two lots at from $7,000 to $7,500. One of these was a trustee in the conveyance before mentioned. Two witnesses for the defendant valued one of the lots at about $5,000.

Upon this testimony the court entered a decree declaring a lien on the two lots in favor of complainant for the amount of her decree, interest, and costs, declaring void, as to complainant, the trust deed in favor of Dumas, and directing a sale of the lots to satisfy the said lien, unless the same be paid within a date fixed. The bill was dismissed as to Agnes Wickersham and her trustees.

*Mr. James A. Cobb, Mr. Mason N. Richardson,* and *Mr. L.. Melendez King* for the appellant.

*Mr. Charles A. Keigwin* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

It is clear from all of the circumstances surrounding the transaction in question, as well as from Neill's admission that he did not recognize the obligation of plaintiff's demand and did not intend to pay it, that he took advantage of the time permitted to elapse between the announcement of the court's opinion and the carrying of the same into a decree, to dispose of the only property that he had subject to execution on that decree, in order to prevent its collection.

As regards the conveyance to secure Dumas, which Neill executed with the intent to defraud the plaintiff, if Dumas knew of that intent and entered into the transaction, not only to secure a debt due to himself, but also to aid Neill in the execution of his purpose; or if he did not in fact actually pay over to Neill, without recall, the $3,000 alleged to have been loaned to him, and for which the security was in part given, then that conveyance is void as to the plaintiff, and the court was right in so decreeing.

The second ground is mainly relied on in support of the decree. If the plaintiff, having examined the defendants, is not concluded by their evidence to the fact of payment and of the motives of Dumas and Neill in the transaction, we think the evidence is of such a character as to support the conclusion deduced therefrom by the trial justice.

Dumas and Neill were intimate friends of many years standing, and had been engaged in at least one speculation together. But few checks could be produced showing payments to Neill by Dumas from 1902 to 1905, on which the alleged indebtedness of $3,500 was founded. It is true that one cannot reasonably be expected always to preserve canceled checks; but, as some were preserved, no satisfactory reason was given why all were not.

Again, two other checks bear date March 28, 1905, and April 4, 1905, respectively; the first being for $210, the second for $80. These dates lie between the announcement of the court's opinion in the plaintiff's original suit, and the actual entry of decree in accordance therewith. Although Neill must reasonably have apprehended that the conveyance would be attacked, he testified that he immediately destroyed the notes aggregating $3,-500, which Dumas claims to have surrendered to him. If these notes had once existed, and there was nothing in their appearance to excite suspicion, their production would have an important bearing on the bona fides of the transaction. Again, it is apparent that the value of Neill's equitable estate in the lots conveyed was worth much less than the amount of the two notes which he secured. The evidence indicates that they were worth not more than $7,500 or $8,000, and were subject to prior mortgages for $2,600. Another circumstance is that, while his interest a year afterwards was sold and bought in by Dumas for $5,-300, Dumas surrendered to Neill both notes, representing $6,-500 and accrued interest.

The defendants had the burden of showing the actual payment of the $3,000 in cash, and their evidence on that point is, to say the least, far from satisfactory. A check for the amount was given to Neill and was paid on April 8. It bears not only the indorsement of Neill, but that of L. Melendez King, who was Dumas's attorney in the transaction. On the same day a cash deposit of $3,010 was made by Dumas. While he was able to remember two other deposits of smaller sums during the same week, he was not able to state the source whence this last and greater deposit had been obtained. The withdrawal and deposit were both in cash, and took place on the same day.

Dumas rested his case on the evidence elicited from himself and Neill in regard to this transaction.

L. Melendez King, who was Dumas's attorney in the transaction, and who indorsed the Neill check, was made a party to the suit. While he participated in the trial of the case as attorney for some of the parties, he neither answered the bill nor was called to testify in regard to the payment of the check. If the

money was actually received by Neill, kept by him, and not re-deposited by Dumas, in person or by representation, on the same day, then King's evidence would be quite important to show the fact. The failure to call him as a witness is a circumstance lend-ing additional doubt to the genuineness of that payment.

The contention of the appellant is substantially: That, as Dumas and Neill were introduced and examined by the plaintiff, she is concluded by their statements as to the indebtedness, the payment, and the good faith of the defendants. In support of this contention they cite *Dravo* v. *Fabel,* 132 U. S. 487, 33 L. ed. 421, 10 Sup. Ct. Rep. 170. All that seems to have been de-cided in that case was that by calling the adverse parties the par-ty calling them made them his own witnesses. It was said: "While the plaintiffs were not concluded by their evidence, and might show they were mistaken, it could not be properly con-tended by the plaintiffs that they were unworthy of credit. The evidence must be given such weight as, under all the circum-stances, it is fairly entitled to receive." From the somewhat meager statement of the conditions presented by that case, it would seem to confine itself to the proposition that one calling a witness, even the adverse party, cannot impeach him. The party is in no wise concluded by it, and it must be given such weight as, under all circumstances, it is entitled to. No attempt was made here to impeach the witnesses. The question was whether, under all the circumstances of the case, their statements aforesaid were to be believed.

In cases like this, it is generally necessary to call and examine the parties to the alleged fraud, and because of their adverse in-terest they may be treated as witnesses on cross-examination. The object of the right of such cross-examination is to draw out of an unwilling witness all such circumstances as may tend to es-tablish the perpetration of the fraud. And while the witness cannot be impeached in the ordinary manner permitted in the case of witnesses called by the opposing party, his testimony goes to the jury, or the court if there be no jury, with such weight as it may be entitled to under all of the circumstances. If a witness makes a direct statement, and then discloses cir-

cumstances inconsistent therewith, it is for the jury or court to determine what is to be believed. The proper rule in such cases was declared by Mr. Justice Peckham of the Supreme Court of the United States, when a member of the court of appeals of New York, in the following language: "What favorable facts the party calling him obtained from such a witness may be justly regarded as wrung from a reluctant and unwilling man, while those which are unfavorable may be treated by the jury with just that degree of belief which they may think is deserved, considering their nature and the other circumstances of the case." *Becker* v. *Koch,* 104 N. Y. 394, 401, 58 Am. Rep. 515, 10 N. E. 701. See also *Cross* v. *Cross,* 108 N. Y. 628, 15 N. E. 333; *McLean* v. *Clark,* 31 Fed. 501, 504; *Emerson* v. *Wark,* 185 Mass. 427, 429, 70 N. E. 482; *Snell* v. *Gregory,* 37 Mich. 500, 502; *Garny* v. *Katz,* 89 Wis. 230, 61 N. W. 762; *Carney* v. *Hennessey,* 77 Conn. 577, 586, 60 Atl. 129.

Tested by this rule, we think the court, trying the case on the facts as well as the law, was not bound to believe the positive statements of the witnesses, in the light of all the circumstances disclosed.

The decree will therefore be affirmed. with costs. *Affirmed.*