# UNITED STATES *v.* BARLOW.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 31. Argued October 29, 30, 1889. — Decided December 2, 1889.

When a part of an established post-route is found to be impracticable by reason of being almost impassable, that portion of it may be changed by the Post-Office Department without thereby creating a new route, requiring a new advertisement and bid.

In order to maintain an action brought to recover moneys alleged to have been fraudulently obtained from the Post-Office Department for expediting mail service, it is not necessary to show that a subordinate officer of the department participated in the fraud.

Money paid by the Post-Office Department to a contractor for carrying the mails under a clear mistake of fact, and not through error in judgment, may be recovered back.

The Postmaster General, in the exercise of the judgment and discretion reposed in him in regard to matters appertaining to the postal service, is not at liberty to act upon mere guesses and surmises, without information or knowledge on the subject.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Maury*, for plaintiff in error, cited: *The Floyd Acceptances*, 7 Wall. 666; *Moffat* v. *United States*, 112 U. S. 24; *Cooke* v. *United States*, 91 U. S. 389; *Lockwood* v. *Kelsea*, 41 N. H. 185; *Wiseman* v. *Lyman*, 7 Mass. 286; *Moore* v. *Mandlebaum*, 8 Michigan, 433; *United States* v. *Cosgrove*, 26 Fed. Rep. 908.

*Mr. Nathaniel Wilson*, (with whom were *Mr. Samuel Shellabarger* and *Mr. J. M. Wilson* on the brief;) for defendants in error, cited: *Martin* v. *Mott*, 12 Wheat. 19; *Belcher* v. *Linn*, 24 How. 508; *United States* v. *Wright*, 11 Wall. 648; *Schurz* v. *United States*, 102 U. S. 378; *Steel* v. *Smelting Co.*, 106 U. S. 447; *Johnson* v. *Towsley*, 13 Wall. 72; *Warren* v. *Van Brunt*, 19 Wall. 646; *French* v. *Fyan*, 93 U. S. 169; *Marquez* v. *Frisbie*, 101 U. S. 473; *Vance* v. *Burbank*, 101 U. S. 514; *Quinby* v. *Conlan*, 104 U. S. 420; *Smelting Company* v. *Kemp*, 104 U. S. 636; *Baldwin* v. *Stark*, 107 U. S. 463; *Ehrhardt* v. *Hogaboom*, 115 U. S. 67; *Page* v. *Bent*, 2 Met. (Mass.) 371; *Marshall* v. *Hubbard*, 117 U. S. 415; *Smith* v. *Richards*, 13 Pet. 26; *Cary* v. *Curtis*, 3 How. 236; *Curtis* v. *Fiedler*, 2 Black, 461; *Liverpool Steamship Co.* v. *Emigration Commissioners*, 113 U. S. 33.

MR. JUSTICE FIELD delivered the opinion of the court.

This action is brought by the United States to recover from the defendants, subcontractors for carrying the mail, moneys paid to them under a mistake of fact caused by their false representations as to the services. It appears that on the 15th of March, 1878, one Luke Voorhees entered into a contract with the United States, represented by the Postmaster General, to carry the mail over a route designated as No. 38,146, from Garland to Ouray, in the State of Colorado, passing by Lake City and several other places mentioned, and back, seven times a week, for $19,000 a year, for a term beginning July 1, 1878, and ending June 30, 1882.

On the 28th of September, 1878, Voorhees made a subcontract with the defendants, Barlow and Sanderson, by which they agreed to transport the mails over the route mentioned, for the period designated, and to perform the service required by his contract with the United States, in consideration whereof they were to receive the pay which was or might become due to him. They were recognized and accepted by the Post-Office Department as subcontractors for the service.

The distance between Garland and Lake City was one hundred and fifty miles, and the time prescribed for the service over it was twenty-seven hours, or five miles and fifty-five hundredths of a mile per hour. The distance between Lake City and Ouray by the route designated was forty-six miles, and the time prescribed by the contract for the transportation of the mails over it was thirty hours, that is, one mile and fifty-three hundredths of a mile per hour. The portion of this latter line, which lay between a place known as Mineral Point and Ouray, a distance of only ten miles, passed over mountains upon which the mails could be carried only a part of the year — in the winter only by men on snowshoes, and at other times only by pack horses. There was, in consequence, great irregularity in the delivery of the mails upon this portion of the route, and much complaint followed, leading, in October, 1878, to its abandonment and the substitution in its place of a line making a detour around the mountains of one hundred and ten miles, passing by way of Barnum, which afforded a good practicable road easily travelled with wagons.

The present action has grown out of the orders of the Post-Office Department in making this change of line, and expediting the service over it, and providing increased compensation for the additional service. The compensation allowed by the original contract, as mentioned above, was $19,000 a year, which, the distance being one hundred and ninety-six miles, was at the rate of about $96.93 a mile. At that rate the compensation for the additional service was allowed, amounting to $10,663.26 a year.

The time prescribed by the original contract for the service between Lake City and Ouray by way of Mineral Point across

the mountains — thirty hours, that is, at the rate of one mile and fifty-three hundredths of a mile an hour — was owing to the great difficulties attending the crossing of the mountains, as already mentioned. When the line was changed to one making a detour of the mountains by way of Barnum, over a road easily traversable by wagons, it was an obvious duty to the public that the service at the rate of one mile and fifty-three hundredths of a mile per hour should be expedited.

Petitions for a change of that portion of the route which led over the mountains came from officers of the counties of Ouray and Hillsdale, in which the proposed new line was to run, and they represented that over its whole distance there was a wagon road by which the mail could be carried the year round. On the 30th of September, 1878, whilst the Post-Office Department had before it the question of opening a new line between Lake City and Ouray, the defendant Sanderson addressed a letter to the Second Assistant Postmaster General, suggesting that, in lieu of the temporary service ordered between Barnum and Ouray, such service should be made by embracing Barnum in the route No. 38,146 between Garland and Ouray, increasing the distance one hundred and ten miles, "and expediting the schedule from the present, at the *pro rata* rate of seventy-two hours, to thirty-six hours between Lake City and Ouray." On the same day Sanderson was consulted by the Post-Office Department, or at least was requested to give an estimate, as to the additional number of horses and men which would be required for the increased expedition proposed, and in response to the request he wrote to the department the following letter verified by his oath :

"WASHINGTON, *Sept.* 30, 1878.
"Hon. THOS. J. BRADY,
        "*Second Ass't Postmaster General :*
"SIR : To perform the service on route No. 38,146, between Lake City and Ouray, on the present schedule of seventy-two hours, requires twenty-two horses and eleven men, and to perform the same service on a schedule of thirty-six hours it will require (66) sixty-six horses and twenty-two men.
                "(Signed)        J. L. SANDERSON.

"Subscribed and sworn to before me this 30th day of September, 1878.

"(Signed)        J. H. HERRON,

"*Notary Public.*"

There was no existing schedule prescribing seventy-two hours for carrying the mail between Lake City and Ouray, as assumed by Sanderson. As the schedule of time prescribed in the original contract between those places over the mountains was at the rate of one mile and fifty-three hundredths of a mile an hour, he assumed that rate as the existing schedule for the new and easily traversable line of one hundred and ten miles, which would require at the same slow pace seventy-two hours. Notwithstanding the obvious error of this assumption, the evidence tended to show that the Post-Office Department acted upon his representations and estimates. Having extended the route one hundred and ten miles, and allowed the additional compensation provided by the statute upon such extension, it also allowed compensation for expediting the service on the new line, upon this extravagant estimate, at the rate of $15,994.77 a year. That sum for the increased expedition was regularly paid during the term of the original contract.

It is admitted that no additional horses and men for which this allowance was made were ever employed. Neither the horses nor the men exceeded the number originally employed to perform the service, and the defendant Sanderson testified that no greater number was necessary to perform it within the thirty-six hours mentioned, and that he never afterwards corrected his estimate, but continued to draw pay from the government as though the additional horses and men were employed.

It appears that the sums thus allowed and paid to the subcontractors for stock and carriers, which were never required and never employed, aggregated $59,592.98, constituting the principal item in the amount claimed in this action.

On the trial, the plaintiffs requested the court to instruct the jury, among other things, to the effect, 1st, that if they believed that service on a portion of the route between Lake

City and Ouray by way of Barnum was expedited and extra compensation allowed for such expedition, upon the supposition that sixty-six horses and twenty-two men would be necessary to carry the mail on that portion upon a schedule of thirty-six hours, and there was in fact no increase in the number of horses and men required above the number which the defendants swore were necessary to perform the service upon a schedule of seventy-two hours, then the plaintiffs were entitled to recover the sums paid upon such allowance, for, in that event they were paid in violation of law; and, 2d, that in determining the questions in issue the jury could only consider the number of horses and men actually necessary to carry the mail, irrespective of the number of men and horses required by the defendants as carriers of passengers and freight.

The court refused to give these instructions, and charged the jury substantially as follows: That if the agreement for compensation for the additional service was made without authority of law and in excess of all provisions of the statute, the government could not recover any part of the consideration paid the defendants for carrying the mail, unless in the making of the contract there was fraud, participated in and countenanced by the officers of the department who acted in the matter; that if they were of opinion that the parties combined and agreed to raise the compensation to an extraordinary figure, with a view to benefit the defendants, knowing that the compensation was excessive, the government could recover it back; but if they were of opinion that those parties acted honestly and fairly, and in the belief that they were dealing fairly with each other, and that the compensation for the services to be performed was reasonable, there could be no recovery, without reference to what the service actually cost, and without reference to what turned out afterwards with respect to the force required. To the refusal of the court to give the instructions requested, and to the instructions given, the plaintiffs excepted. The jury found a verdict for the defendants, upon which judgment was rendered in their favor, to review which the case is brought to this court.

The statutes upon which the government relies to recover in this case upon the facts presented, are contained in sections 3960, 3961 and 4057 of the Revised Statutes. Those sections are as follows:

"SEC. 3960. Compensation for additional service in carrying the mail shall not be in excess of the exact proportion which the original compensation bears to the original service; and when any such additional service is ordered, the sum to be allowed therefor shall be expressed in the order, and entered upon the books of the department; and no compensation shall be paid for any additional regular service rendered before the issuing of such order.

"SEC. 3961. No extra allowance shall be made for any increase of expedition in carrying the mail, unless thereby the employment of additional stock and carriers is made necessary, and in such case the additional compensation shall bear no greater proportion to the additional stock and carriers necessarily employed than the compensation in the original contract bears to the stock and carriers necessarily employed in its execution."

"SEC. 4057. In all cases where money has been paid out of the funds of the Post-Office Department under the pretence that service has been performed therefor, when, in fact, such service has not been performed, or as additional allowance for increased service actually rendered, when the additional allowance exceeds the sum which, according to law, might rightfully have been allowed therefor, and in all other cases where money of the department has been paid to any person in consequence of fraudulent representations, or by the mistake, collusion, or misconduct of any officer or other employé in the postal service, the Postmaster General shall cause suit to be brought to recover such wrong or fraudulent payment or excess, with interest thereon."

In their amended complaint the plaintiffs claim not only the amount allowed and paid each year for the expedited service, but also the amount allowed and paid each year, namely, $10,663.26, for the additional service by the new line from Lake City to Ouray. It would seem from what took place on

the trial that the latter amount was claimed on the ground that that route was a distinct one from that prescribed in No. 38,146, and that the contract for its service could only be made after advertisement for bids. The judge who tried the case below was of that opinion, and so instructed the jury; but we are unable to agree in that view. The new line became necessary to avoid an almost impassable portion of the original route, and changes of that kind can be authorized by the Postmaster General within the established regulations of the Post-Office Department. Those of 1873 provide in terms, that "the Postmaster General may order an increase or extension of service on a route by allowing therefor a *pro rata* increase on the contract pay." Such increase of service may be made by enlarging the distance to be travelled when that will better accomplish the object of the original contract, as well as by requiring a greater number of trips between specified points. That object was accomplished in this case by the increase of distance from the detour around the mountains. The carrying of the mails between the original terminal points was thereby greatly facilitated. The compensation allowed for this additional service over the hundred and ten miles of increased route was in accordance with section 3960 of the Revised Statutes in the exact proportion which the original compensation bore to the original service. There was no excess in the allowance.

But the amount allowed for the expedited service over the new line stands upon a different footing. The evidence produced on the trial tended to show that the allowance of $15,994.77 each year for that service was made upon a false estimate of the additional expenses which would be required; that a slight consideration of the subject would have exposed its error; and that officers of the department and the subcontractors were well acquainted with the fact that the new line was one that could be more easily travelled. It appeared by the petitions presented to the department that the change of route was asked because such was the condition of the new line desired, while the line of the original route between Mineral Point and Ouray was impassable for the greater part

of the year, and then only by pack-horses or on snowshoes. To apply the same schedule time to both lines between the same points — the original and the new one — was to ignore the known differences in the character of the roads over them, as disclosed by the evidence on file in the department. It is true the head of the department and those who stand immediately under him as assistants or deputies are unable in person to supervise all the estimates made in so extensive a department as that of the Post-Office, and, therefore, great reliance is placed upon the judgment in those matters of clerks and subordinate officers. Irregularities and favoritism and corrupt practices are therefore sometimes found to exist which escape observation and detection. It was to avoid fraud and mistakes from this as well as from other causes that sections 3961 and 4057 were adopted.

Section 3961 declares that "no extra allowance shall be made for any increase of expedition in carrying the mail unless thereby the employment of additional stock and carriers is made necessary." And section 4057, after providing that "in all cases where money has been paid out of the Post-Office Department under the pretence that service has been performed therefor, when, in fact, such service has not been performed, or as additional allowance for increased service actually rendered, when the additional allowance exceeds the sum which, according to law, might rightfully have been allowed therefor," declares that "in all other cases where money of the department has been paid to any person in consequence of fraudulent representations, or by the mistake, collusion, or misconduct of any officer or other employé in the postal service, the Postmaster General shall cause suit to be brought to recover such wrong or fraudulent payment or excess, with interest thereon."

These sections would seem to cover the present case. It cannot be pretended that the allowance for expediting the service over the new route was not made upon erroneous representations. It is admitted that such was their character. Whether they were fraudulent as well as erroneous was a matter to be left to the jury, and if fraudulent, their influence in vitiating the payment and authorizing the recovery of the

moneys cannot be affected by knowledge of their character and participation in the results sought to be obtained, by any subordinate officers of the department. Whether they participated in the fraud or were simply imposed upon by the defendants, cannot change the legal liability of the latter. The court, therefore, erred in instructing the jury that in such cases there could be no recovery of the money unless the fraud was participated in and countenanced by such officers.

But, aside from any consideration of the question of fraud, the evidence produced at the trial tended to show that the allowance was made to the subcontractors, for the expedited service, upon a clear mistake as to what additional number of men and of animals were required for such service, and that the money was paid in ignorance of the fact that no additional number had been employed in the performance of that service. Such being the evidence, the plaintiffs were entitled to the instructions asked which are mentioned above. It is no answer to say that the amount of compensation for the expedited service was a matter for the determination of the Post-Office Department. Its determination cannot operate to defeat the express declaration of the statute prescribing the conditions upon which contracts with the department shall be made. If an allowance is founded upon a clear mistake of fact, not a mere error of judgment, and payments are in consequence made, the statute provides that " the Postmaster General shall cause suit to be brought to recover such wrong or fraudulent payment of excess with interest," which means that if such mistake be established in the action of the department a recovery must follow.

We admit that where matters appertaining to the postal service are left to the discretion and judgment of the Postmaster General, the exercise of that judgment and discretion cannot in general be interfered with, and the results following defeated. But the very rule supposes that information upon the matters upon which the judgment and discretion are invoked is presented to the officer for consideration, or knowledge respecting them is possessed by him. He is not at liberty, any more than a private agent, to act upon mere

guesses and surmises, without information or knowledge on the subject. If the defendant Sanderson intended no fraud by his letter of September 30, 1878, to the Assistant Postmaster General, which he verified by his oath; if, in contradiction to his positive assertions, his testimony can be taken, that he did not know at the time anything about the matter in relation to which he was writing, and that the officers of the department were well aware that he had no knowledge or information on the subject; then they acted upon his guesses only, and not upon evidence upon the subject, and their decision cannot be received as conclusive. It would be, indeed, a mischievous doctrine in its consequences if a decision thus made could conclude the government from recovering its money, paid for additional stock and carriers, which were never required and never employed in its service.

It is also true that where the subjects in relation to which the contract of parties is made, are necessarily of an uncertain and speculative character or value, and that is known to the parties, a mere mistake by them in their estimate of the value is not deemed sufficient to authorize a recovery of the moneys paid upon the erroneous estimate. If this were a case of that description no recovery could be had. But whether it was so or not was the very issue in the cause to be determined by the jury upon the evidence.

It is familiar law that an action may be maintained to recover back money paid as the price of articles sold, or of work done, when the articles are not delivered or the work not done. The reason is that the consideration for the payment has failed. It is not perceived that the principle of law sought to be applied in this case is in any essential particular different. If the contract for extra allowance was void by reason of fraud or clear mistake, the action becomes simply one for the return of moneys paid for services of stock and carriers never rendered, but which when payment was made were believed to have been rendered. As in the case of goods not delivered, or work ordered not done, the consideration to the party paying has failed. As said by Baron Parke in *Kelly* v. *Solari*, 9 M. & W. 54, 58, "Where money is paid to

another under the influence of a mistake, that is, upon the supposition that a specific fact is true, which would entitle the other to the money, but which fact is untrue, and the money would not have been paid if it had been known to the payer that the fact was untrue, an action will lie to recover it back, and it is against conscience to retain it." See also *Townsend* v. *Crowdy*, 8 C. B. N. S. 477; *Strickland* v. *Turner*, 7 Exch. 208. Reasons for the application of the rule are much more potent in the case of contracts of the government than of contracts of individuals; for the government must necessarily rely upon the acts of agents, whose ignorance, carelessness, or unfaithfulness would otherwise often bind it, to the serious injury of its operations.

*The judgment must be reversed, and the cause remanded for a new trial, and it is so ordered; and it is further ordered that this judgment be entered as of the 30th day of October, A.D. 1889, the day upon which the said cause was submitted to the court for decision, the said defendant in error Barlow having since died.*