## UNITED STATES v. GREAT NORTHERN RY. CO.

### No. 9334.

Circuit Court of Appeals, Eighth Circuit.
March 15, 1932.

See also (D. C.) 22 F.(2d) 865; (D. C.) 46 F.(2d) 999.

Elmer B. Collins, Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., and John Lord O'Brian, Asst. to Atty. Gen., on the brief), for the United States.

F. G. Dorety, of St. Paul, Minn. (R. E. L. Smith, of Washington, D. C., and R. J. Hagman, of St. Paul, Minn., on the brief), for appellee.

Before KENYON, VAN VALKEN-BURGH, and GARDNER, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

The Great Northern Railway Company, a corporation of the state of Minnesota, is a carrier as defined in section 209 of the Transportation Act of 1920 (49 USCA § 77), in that it is a carrier whose railroad, or system of transportation, was under federal control at the time such control terminated at 12:01 a. m. on March 1, 1920. Said section 209 fixed the six months' period, beginning March 1, 1920, as a so-called guaranty period during which the railway operating income of a common carrier, with which the Director General of Railroads had made a contract fixing the amount of just compensation to such carrier under the Federal Control Act (40 Stat. 451) should not be less than one-half the amount named in such contract as the annual compensation of such carrier for the period of federal control. Under this provision the guaranteed income of appellee for the six months' guaranty period was $14,306,522.65. Paragraphs (g) and (h) of said section 209 provide thus:

"(g) The Commission shall, as soon as practicable after the expiration of the guaranty period, ascertain and certify to the Secretary of the Treasury the several amounts necessary to make good the foregoing guaranty to each carrier. The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States, for the amount shown in such certificate as necessary to make good such guaranty. * * *

"(h) Upon application of any carrier to the Commission, asking that during the guaranty period there may be advanced to it from time to time such sums, not in excess of the estimated amount necessary to make good the guaranty, as are necessary to enable it to meet its fixed charges and operating expenses, the Commission may certify to the Secretary of the Treasury the amount of, and times at which, such advances, if any, shall be made. The Secretary of the Treasury, on receipt of such certificate, is authorized and directed to make the advances in the amounts and at the times specified in the certificate, upon the execution by the carrier of a contract, secured in such manner as the

Secretary may determine, that upon final determination of the amount of the guaranty provided for by this section such carrier will repay to the United States any amounts which it has received from such advances in excess of the guaranty, with interest at the rate of 6 per centum per annum from the time such excess was paid." 41 Stat. 464, § 209 (h).

Under the permission granted by paragraph (h) appellee applied for and received advances aggregating $6,500,000. The certificates of the Commission authorizing these payments were issued "under section 209 (h) Transportation Act, 1920," on June 26, 1920; August 31, 1920; and November 4, 1920, respectively. Section 209 had been construed to authorize advances of this nature only upon applications filed before the guaranty period expired August 31, 1920. February 14, 1921, appellee, being in urgent need of financial assistance to meet its current obligations, made application for a further payment of $6,000,000. Realizing that, because its application was made out of time, it could not cash a certificate issued upon that application, it stated that it desired this certificate for credit purposes only, and as collateral for a loan. Accordingly the Commission, after examining an exhaustive return made by the carrier, filed February 14, 1921, issued, on February 23, 1921, the following certificate numbered A-328:

"Certificate of Interstate Commerce Commission Under Section 209 (g), Transportation Act, 1920.

"To the Secretary of the Treasury of the United States:

"1. The Interstate Commerce Commission, hereinafter called the Commission, hereby certifies that the Great Northern Railway Company, a corporation of the state of Minnesota, hereinafter called the carrier, is a carrier as defined in paragraph (a) of section 209 of the Transportation Act, 1920, in that it is a carrier by railroad whose railroad system of transportation was under Federal control at the time such Federal control terminated at 12:01 A. M. March 1, 1920; that the carrier filed with the Commission on or before March 15, 1920, a written statement that it accepted all of the provisions of the said section 209.

"2. The Commission has ascertained and hereby certifies to the Secretary of the Treasury that the amount of six million dollars ($6,000,000) in addition to any other sum or sums heretofore certified in favor of the carrier under section 209 of the Transportation

Act, 1920, is necessary to make good to said carrier the guaranty provided by the said section.

"3. The Commission hereby certifies that such amount of six million dollars ($6,000,000) cannot be reduced by further accounting or otherwise, and there may be, upon further investigation, additional amounts found due to said Great Northern Railway Company to make good to said carrier the guaranty of section 209 of the Transportation Act, 1920, and which if, and when, ascertained by the Commission will be certified to the Secretary of the Treasury."

The return made by appellee, February 14, 1921, as aforesaid, was a very elaborate one, and was made in response to an order of the Commission of October 18, 1920, requiring the carriers to file with the Commission "true and correct returns to the questionnaire or form of statement which accompanies this order and is made a part hereof." This form of statement was thus described: "Outline of Form for Use by Carriers in Presenting Claim or Statement as a Basis for Settlement Under section 209 of the Transportation Act, 1920."

The outline covers twenty-two printed pages of the record and calls for an exhaustive return, under oath, of every conceivable railway operative element essential to a basis for final settlement between government and carrier under the provisions of the Transportation Act. The purpose in mind when the order of October 18, 1920, was issued is thus expressed in its opening clause: "Whereas, Under the provisions of section 209 (g) of the transportation act, 1920, this Commission is charged with the duty of ascertaining and certifying to the Secretary of the Treasury as soon as practicable after the expiration of the guaranty period the several amounts necessary to make good the guaranty to each carrier to which said section is applicable."

The return was demanded on or before January 1, 1921; but that of appellee was not completed until February 14th. It contained one hundred and nineteen pages of tables and statistical matter. Meantime it was realized that a considerable period of time must elapse before computations for final settlements could be made with the many carriers whose systems of transportation had been placed under federal control, and that, turning back the railroads with an increase of expenditures much greater, in proportion, than the increase of revenues, might, and probably would, lead to failures

and receiverships, unless the provision of section 209 for advancements pending final settlement should be extended beyond the guaranty period fixed by that section. Accordingly a bill, known as the Winslow Bill, was before Congress in an advanced state when the certificate of February 23, 1921, was issued to appellee. Three days later (February 26, 1921) it became a law as section 212 of the Transportation Act (41 Stat. 1145 [49 USCA § 79]). It contains the following provisions most pertinent to this inquiry:

"(a) In making certifications under section 204 or section 209, the Commission, if not at the time able finally to determine the whole amount due under such section to a carrier or the American Railway Express Company, may make its certificate for any amount definitely ascertained by it to be due, and may thereafter in the same manner make further certificates, until the whole amount due has been certified. The authority of and direction to the Secretary of the Treasury under such sections to draw warrants is hereby made applicable to each such certificate. * * *

"(b) In ascertaining the several amounts payable under either of such sections, the Commission is authorized, in the case of deferred debits and credits which can' not at the time be definitely determined, to make, whenever in its judgment practicable, a reasonable estimate of the net effect of any such items, and, when agreed to by the carrier or express company, to use such estimate as a definitely ascertained amount in certifying amounts payable under either of such sections, and such estimates so agreed to shall be prima facie but not conclusive evidence of their correctness in amount in final settlement."

Thereupon appellee made application for a new certificate of indebtedness under the provisions of section 209 as thus amended. February 28, 1921, the Bureau of Finance of the Interstate Commerce Commission made its report upon this application. It said: "The applicant has filed its claim for final settlement under section 209 of the Transportation Act, 1920, and at the same time is making an urgent appeal for a partial payment of $6,000,000, to be substituted for certificate No. A-328 issued for credit purposes only, to provide for the payment of taxes and to meet other pressing obligations. We have examined the data submitted by the applicant and find that the Government would have to pay not less than $15,705,688 to make

good the guaranty, of which $6,500,000 had already been advanced."

This report is made under the following heading: "In Re Application for Partial Payment Under Section 209 of the Transportation Act, 1920, as Amended by Section 212."

The Bureau of Finance made various adjustments in accordance with the information before it, and the factors and formulæ then recognized and employed in transactions of this nature between appellant and other carriers. This work of the Bureau appears to have been very thorough, as revealed by the testimony of the government's witness: "There were several representatives of the Bureau both of the accounting and engineering sections engaged in conferences with different representatives of the defendant during the working or week days between February 14th and 23rd, approximately 8 or 9 days;" and further, "Wherever the defendant had followed a method or principle which the Commission considered questionable, it made a deduction to cover it."

It is conceded that the Commission, through its Bureau, made a thorough mathematical check of the figures in appellee's returns. It will be remembered that those returns were made upon a form and in the manner prescribed by the Commission in its order of October 18, 1920. The result of the adjustments made by the Bureau of Finance was to reduce the total amount claimed by appellee—$18,498,392, to $15,705,688. The amount of the reduction—$2,792,704—included all items obviously subject to disapproval and disapproved, together with all items which the Bureau considered questionable because not yet definitely considered and determined. This reduction, as stated by the report, was made "for the purpose of this payment" of $6,000,000 recommended—not, of course, as for final settlement. The Commission, approving and adopting the report of its Bureau of Finance, March 1, 1921, canceled certificate A-328 dated February 23, 1921, and issued its certificate A-329 as follows:

"Certificate of Interstate Commerce Commission Under Section 209 (g), Transportation Act, 1920, as Amended by Section 212.

"To the Secretary of the Treasury of the United States:

"1. The Commission hereby certifies that it has this date cancelled certificate No. A-328, dated the 23rd day of February,

1921, which certified to the Secretary of the Treasury of the United States a payment of Six million dollars ($6,000,000) in favor of the Great Northern Railway Company.

"2. The Interstate Commerce Commission, hereinafter called the Commission, hereby certifies that the Great Northern Railway Company, a corporation of the State of Minnesota, hereinafter called the carrier, is a carrier as defined in paragraph (a) of section 209 of the Transportation Act 1920 (49 US CA. § 77 (a), in that it is a carrier by railroad whose railroad or system of transportation was under Federal control at the time such Federal control terminated at 12:01 A. M. on March 1, 1920; that the carrier filed with the Commission on or before March 15, 1920, a written statement that it accepted all of the provisions of the said section 209.

"3. The Commission has ascertained and hereby certifies to the Secretary of the Treasury that the amount of Six million dollars ($6,000,000) in addition to any other sum or sums heretofore certified in favor of the carrier under section 209 of the Transportation Act, 1920, is necessary to make good to said carrier the guaranty provided by the said section.

"4. The Commission hereby certifies that such amount of Six million dollars ($6,000,-000) cannot be reduced by further accounting or otherwise, and there may be, upon further investigation, additional amounts found due to said Great Northern Railway Company to make good to said carrier the guaranty of section 209 of the Transportation Act, 1920, and which if, and when, ascertained by the Commission will be certified to the Secretary of the Treasury."

The railroad thus obtained advances aggregating $12,500,000. Several years later the Commission, in making its computations for final settlements, made some changes in the formulæ and factors theretofore employed or accepted which materially affected its determination of the amounts ultimately conceived by it to be due to or from the various carriers. June 17, 1925, it issued its certificate A–1041, "under section 209 (g) Transportation Act, 1920." No reference is made to the amendment of February 26, 1921 (section 212). By this certificate it found that the amount necessary to make good to appellee the guaranty provided by said section 209 is $11,178,887.31; that the carrier had received $12,500.00; and that there was due the United States, on account of overpayment, $1,321,112.69. Demand for this amount was made and payment was refused, and appellant brought suit in the district court of the district of Minnesota to recover this sum, alleging that the overpayment was made by mistake, and without authority of law. A jury was waived by stipulation of parties. At the close of all the evidence in the trial of this case the following entry appears: "Attorneys for the respective parties move the Court for judgment in favor of the respective parties on the sole ground that the record supports no other disposition of the case, the party whose motion is denied to be allowed an exception."

The court entered a general finding and judgment for appellee.

▆▆▆ By the submission of this case to the court under the provisions of Revised Statutes, §§ 649 and 700 (28 USCA §§ 773, 875), followed by dual motions for judgment at the conclusion of all the evidence, the general finding of the court was equivalent to the verdict of a jury. The motion for judgment, with exception preserved to its refusal, presents a question of law reviewable by an appellate court. Maryland Casualty Co. v. Jones, 279 U. S. 792, 49 S. Ct. 484, 73 L. Ed. 960; White v. United States (C. C. A. 10) 48 F.(2d) 178. In such case the appellate court will not reverse for error of fact, such as a finding contrary to the weight of evidence, but will determine whether the record contains substantial and sufficient evidence to support the finding and judgment. Federal Intermediate Credit Bank v. L'Herisson (C. C. A. 8) 33 F.(2d) 841, and cases cited in notes; Vicksburg, Shreveport & Pacific Ry. Co. v. Anderson-Tully Co., 256 U. S. 408, 41 S. Ct. 524, 65 L. Ed. 1020; United States v. U. S. Fidelity Co., 236 U. S. 512, 527, 35 S. Ct. 298, 59 L. Ed. 696; Dooley v. Pease, 180 U. S. 126, 21 S. Ct. 329, 45 L. Ed. 457; Runkle v. Burnham, 153 U. S. 216, 225, 14 S. Ct. 837, 38 L. Ed. 694; Lehnen v. Dickson, 148 U. S. 71, 13 S. Ct. 481, 37 L. Ed. 373; Case Mfg. Co. v. Soxman, 138 U. S. 431, 438, 11 S. Ct. 360, 34 L. Ed. 1019; Hathaway v. First Nat. Bank, 134 U. S. 494, 10 S. Ct. 608, 33 L. Ed. 1004; Allen v. St. Louis Bank, 120 U. S. 20, 30, 7 S. Ct. 460, 30 L. Ed. 573; Martinton v. Fairbanks, 112 U. S. 670, 672, 5 S. Ct. 321, 28 L. Ed. 862.

The position of the government is thus stated in its summary of argument: "The District Court erred in finding and holding that the evidence entitled appellee to judgment, and in denying the Government's mo-

tion for judgment made on the ground that the evidence would support no other conclusion."

Its contentions are (1) that the evidence establishes a clear case of payment through mistake, and (2) that, "since the evidence positively establishes that a mere estimate and not a definite ascertainment was made by the Commission before issuing the certificate on March 1, 1921, the over-payment was made contrary to and without compliance with section 212, and hence was without authority and unlawful."

▮ The right of the government to recover money paid by mistake is well settled; and of course the Commission had no power to authorize partial payments under section 212 except in amounts definitely ascertained within the meaning of that section. We may resort to the legislative history of that statute to ascertain the great purpose of the act, the environment at the time of its enactment, the reasons that induced its passage, and the relief sought to be granted. Federal Trade Commission v. Raladam Co., 283 U. S. 643, 650, 51 S. Ct. 587, 75 L. Ed. 1324; Richbourg Motor Co. v. United States, 281 U. S. 528, 536, 50 S. Ct. 385, 74 L. Ed. 1016, 73 A. L. R. 1081; United States v. Missouri Pacific R. R. Co., 278 U. S. 269, 278, 49 S. Ct. 133, 73 L. Ed. 322; United States v. Bhagat Singh Thind, 261 U. S. 204, 214, 43 S. Ct. 338, 67 L. Ed. 616; Work v. Braffet, 276 U. S. 560, 566, 48 S. Ct. 363, 72 L. Ed. 700; Standard Oil Co. v. United States, 221 U. S. 1, 50, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. Mullendore (C. C. A. 8) 35 F. (2d) 78.

While the language of the act itself seems clear, and its meaning unmistakable, the debates attending its passage, conducted largely by members of the committees in charge of the measure, are instructive as emphasizing the predicament of the railroads sought to be relieved, and reveal clearly the true legislative intent. It was contended by some objecting members that the carriers receiving partial payments in advance of final settlement should give security, and contract to repay any amount so received in excess of the guaranty. This position was finally presented in the form of an amendment offered in the House by Mr. Barkley of Kentucky:

"Mr. Barkley: Mr. Chairman, I offer an amendment. * * * At the end of line one, page 2, insert: 'Before making such payment or drawing such warrant, unless it be upon a final settlement, the Secretary of the Treasury shall require the carrier to execute a contract on such security as the Secretary of the Treasury may determine, that upon final determination of the amount of the guaranty under sections 204 and 209, such carrier will repay to the United States any amounts which it has received from such partial payment in excess of the guaranty with interest at the rate of 6% per annum from the time such excess was paid.' "

This amendment was lost on division by a vote of 115 to 65, the House standing firmly by the position that, to make this relief effective, the partial payments made should be binding upon the government, and that the Interstate Commerce Commission should be relied upon to protect its interests by making definite ascertainments. The following from page 2813 of the Congressional Record illustrates this attitude:

"Mr. Denison said: The Interstate Commerce Commission is the tribunal which we have entrusted with the authority to make these final settlements, and if we can depend upon them to protect the interests of the Treasury in making final settlements, it seems to me we can very well do so in making partial settlements.

"Mr. Barkley: But the Interstate Commerce Commission is liable to make mistakes as well as anybody else, and these accounts will be audited by individuals in the Interstate Commerce Commission. Does the gentleman think that the Government should be protected if it should occur that a mistake was made?

"Mr. Denison: We have got to reach settlements some time. I was informed this morning that the accounting department of the Interstate Commerce Commission is the finest accounting institution of its kind in the United States if not in the world, and if we cannot depend upon it to safeguard the interests of the Treasury in making these settlements, then we ought to endeavor to provide some tribunal upon whom we can depend."

This purpose of Congress to make payments under paragraph (a) of section 212 conclusive and binding is further shown by its discrimination respecting deferred debit and credit items covered by paragraph (b). As originally introduced, this paragraph provided that the "reasonable estimate" of the Commission respecting these items, when agreed to by the carrier, "shall be binding in final settlement." An amendment was offered striking out the word "binding" and inserting the words "prima facie but not con-

clusive evidence of their correctness in amount." This amendment was duly debated, and carried. Failure to make a similar provision with respect to the items embraced in paragraph (a) emphasizes the purpose of Congress, elsewhere expressed, to make their ascertainment conclusive and binding on final settlement.

That the Commission was fully aware of the purpose and purport of section 212 is established by a letter from its Chairman, Hon. Edgar E. Clark, to Hon. John J. Esch, Chairman of the House Committee on Interstate and Foreign Commerce, during hearings on this legislation before that committee. This letter, dated January 22, 1921, while the Winslow Bill was pending, says in part:

"This morning Representative Sims, member of your committee, called and discussed with me some features of H. R. 15713, more particularly paragraph (b) of section 212.

"Mr. Sims thought that there was difference of understanding as to the intent of the language in this paragraph, and he asked that I write you my conception of the manner in which, if enacted in its present form, it would be interpreted and applied by the Commission.

"Paragraph (a) of section 212 very definitely authorizes certificates in partial payment and payment of such certificates. It will be noted that such certificates are by the terms of this paragraph to be 'for any amount definitely ascertained by it (the Commission) to be due.' I think there is no misunderstanding in that language. There is no room for misunderstanding of our conception of our duties under it, which is that a partial payment certificate would not be made for any amount in excess of an amount 'definitely ascertained' by us to be due the carrier."

And this respecting paragraph (b): "The purpose of this paragraph, as I understand it, is to make possible speedy and final settlements under terms fair to the carrier and fair to the Government, and to make final settlement under such an agreement rather than to have some of these claims drag along for many months or years waiting the final determination of the debit and credit items, which final determination might in small measure affect the balance."

It appears that, when appellee's claim was presented February 14, 1921, representatives of the railroad conferred with the director and assistant director of the Commission's Bureau of Finance and were told that they could get either final settlement or an advance. That it would take about ten days in either case. Mr. Bunting, acting director, suggested "that it might be in defendant's interest to secure an advance rather than a final payment at that time because there were some items which the Commission was disallowing such as equation on depreciation and retirements which might later be found by the Commission in the carriers' favor and that by securing final settlement at that time, defendant would be compelled to waive those items."

Acting on that suggestion, appellee made application for the partial payment.

It can scarcely be maintained that the Commission, in discharging the duties imposed upon it by the Act of Congress (section 212), acted in ignorance of the terms of that law or was mistaken as to its requirements, or as to the facts upon which this partial certificate was issued. This is made evident by the letter of Mr. Clark to the Chairman of the Committee of the House before which hearings upon the Winslow Bill were being held, to the effect that the terms of the act gave no room for misunderstanding of the duty of the Commission, which was that no partial payment certificate should be made for an amount in excess of that definitely ascertained by the Commission to be due to the carrier. March 2, 1921, the day after certificate A-329 was issued to appellee, the Director of the Commission's Bureau of Finance issued a memorandum to his assistant director in which he said: "Partial payments will be made upon request by letter provided returns to the Commission's orders of October 18, 1920, and January 5, 1921 have been received. Partial payments are not based upon estimates as were advances under section 209 (h), but represent definite ascertainments. For such definite ascertainments the returns under the Commission's orders are necessary."

Of course he had not received, over night, the information upon which this memorandum was based. It is to be noted that the carrier's returns to the Commission's order of October 18, 1920, were already before that body as a basis for the partial certificate requested. December 14, 1921 (70 I. C. C. 711, 714) the Commission said:

"We are required to make a definite ascertainment for partial-payment purposes as clearly as we are required to make a definite ascertainment in final settlements. We shall require all carriers which accepted the provisions of section 209 of the transporta-

tion act, 1920, to file with us on or before March 1, 1922, final statements of amounts due to them or to the United States, as the case may be, under the provisions of section 209, and as a general rule no further partial payments will be certified until the information necessary for a final settlement is at hand. A complete set of forms for making the final returns required is hereto attached marked 'Forms for final return of amounts due to or from the United States under the provisions of section 209 of the transportation act, 1920.'

"By our orders of October 18, 1920, and January 5, 1921, we required carriers to furnish certain information to enable us properly to discharge the duties imposed upon us under the guaranty provisions of section 209."

In the report of the Commission embraced in the record, it is conceded that the Act of February 26, 1921, required definite ascertainments and that the certificate issued was definite in form, based upon the facts as then known. That certificate recited that "such amount of Six million dollars ($6,000,000) cannot be reduced by further accounting or otherwise, and there may be, upon further investigation, additional amounts found due to said Great Northern Railway Company to make good to said carrier the guaranty of section 209 of the Transportation Act, 1920, and which if, and when, ascertained by the Commission will be certified to the Secretary of the Treasury."

The report says further: "The intent in these certificates was to leave an ample margin still due and uncertified to protect the interest of the Government."

It would be difficult more precisely to define a "definite ascertainment" within the meaning of section 212. While the ultimate amount on final settlement was not definitely determined, that of the partial payment was fixed beyond the possibility of reduction "by further accounting or otherwise." This inquiry is concerned only with the status of the partial payment. The Commission, in its report, suggests that the statute should be read "in the light of the circumstances surrounding its administration." So read, it contemplated partial payments to be made promptly, in advance of the long delay incidental to final settlements—in this case a period of more than four years; this was deemed necessary, as stated in the debates, to prevent "a financial and business condition in this country of such character and

such proportions, fraught with so much danger to the public interests, and so disruptive of all the business conditions of the country, that even our supposedly panic proof Federal Reserve Banking System would not be able to save the country from a panic."

It was therefore determined that these partial advances should be definitely ascertained, and that the Interstate Commerce Commission should be the arbiter between the carrier and the Treasury in certifying such advances. Under these circumstances the Commission occupies a position closely analogous to that of an umpire or arbitrator agreed upon by contract, in which it is provided that his finding shall be final and binding, unless set aside for fraud, gross mistake, or failure to exercise an honest judgment. United States v. George A. Fuller Co. (C. C. A. 8) 14 F.(2d) 813; United States v. Hurley (C. C. A. 8) 182 F. 776; United States v. Shrewsbury, 23 Wall. 508, 23 L. Ed. 78; Kihlberg y. United States, 97 U. S. 398, 24 L. Ed. 1106; Ripley v. United States, 223 U. S. 695, 750, 32 S. Ct. 352, 56 L. Ed. 614; United States v. Mason & Hanger Co., 260 U. S. 323, 43 S. Ct. 128, 67 L. Ed. 286.

Neither fraud, gross mistake, nor failure to exercise an honest judgment is or can be imputed to the Commission in the issuance of certificate A–329. It is suggested that, as found by the Supreme Court in Great Northern Railway v. United States, 277 U. S. 172, 48 S. Ct. 466, 467, 72 L. Ed. 838, the Transportation Act of 1920 "did not confer upon the Commission power to order anything in connection with the issue of the certificates" which are, therefore, mere findings of fact; that these certificates are issued to the Secretary of the Treasury and not to the carrier to be benefited. The inference sought to be drawn seems to be that the carrier, therefore, acquired no vested interest in their payment. But the act designated the Commission as the tribunal authorized conclusively to find the facts necessary as a basis for payment, and provided that "the authority of and direction to the Secretary of the Treasury under such sections to draw warrants is hereby made applicable to each such certificate."

The grounds upon which the government has been held entitled to recover for improvident payments made by its officers and agents are mainly where such acts are fraudulent. unauthorized or clearly mistaken. Fritch v. United States (C. C. A. 9) 236 F. 133; United States v. Olmsted (C. C. A. 8) 118 F. 433; Hunter v. United States, 5 Pet. 173, 188, 8 L. Ed. 86; Pine River Logging

Co. v. United States, 186 U. S. 279, 22 S. Ct. 920, 46 L. Ed. 1164; United States v. Cair, 132 U. S. 644, 10 S. Ct. 182, 33 L. Ed. 483.

Also, generally, in the absence of statute "the United States is not bound by a mistaken construction of an act of Congress made by one of its officials, and may recover money paid pursuant to such construction." United States v. Gilhmore (C. C.) 189 F. 761, 762; United States v. Barlow, 132 U. S. 271, 10 S. Ct. 77, 80, 33 L. Ed. 346. In the case last cited this ruling is thus qualified:

"If an allowance is founded upon a clear mistake of fact, not a mere error of judgment, and payments are in consequence made, the statute provides that 'the postmaster general shall cause suit to be brought to recover such wrong or fraudulent payment of excess, with interest,' which means that, if such mistake be established in the action of the department, a recovery must follow. * * *

"It is also true that where the subjects in relation to which the contract of parties is made are necessarily of an uncertain and speculative character or value, and that is known to the parties, a mere mistake by them in their estimate of the value is not deemed sufficient to authorize a recovery of the moneys paid upon the erroneous estimate. If this were a case of that description, no recovery could be had."

Walker v. United States (C. C. Ala.) 139 F. 409, held that: "If officers of the United States are authorized to shape its course of conduct as to a particular transaction, and they have acted within the purview of their authority, their acts or omissions may in a proper case work an estoppel against the government." Affirmed (C. C. A. 5) 148 F. 1022.

In Ritter v. United States (C. C. A. 3) 28 F.(2d) 265, 267, this language is found: "The acts or omissions of the officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government, if the officers have acted within the scope of their authority."

At this time, as the report of the Commission states, allowances for maintenance had been based upon a general formula of the railways, disclosed in their reports in response to the Commission's order of October 18, 1920, and elsewhere. The formula and factor subsequently adopted by the Commission were not conceived, or at least reported, until many months later. The report of the Commission of June 8, 1926, states that its

conclusions differed from the railway formula "chiefly in the use of a general equation factor instead of separate factors for each group of maintenance expenditures; in the disallowance of claims based on so-called inefficiency of labor, the use of purchase instead of charge-out prices, the use of separate factors for new and scrap materials, and in the treatment of adjustments for differences in amount and use of property." It will be remembered that in making computations for the issue of the certificate of March 1, 1921, the Commission struck from the claim of the carrier all items considered questionable because not at that time fully considered and determined.

We think that, under the authority lodged in it by the Act of February 26, 1921, the Interstate Commerce Commission, at the time the partial certificate in controversy was issued, had full power, in its discretion, to adopt and act upon the information and data before it respecting computations to be made in arriving at the definite ascertainment required by the law, and that it did so. The record discloses no mistake, either of fact or law, nor that the Commission exceeded its authority under the remedial statute. It took affirmative action within the scope of its authority, with no misconception or misconstruction of the terms of that statute, and with full knowledge of the existing facts essential to the determination it was called upon to make. No fraud or collusion is, or could be, claimed. Its conclusion, as evidenced by its certificate of March 1, 1921, is deemed to be conclusive.

In United States v. Louisville, 169 U. S. 249, 18 S. Ct. 358, 360, 42 L. Ed. 735, the claim was that the government officers had made an error in auditing and allowing the amount of refund of taxes to the city of Louisville, under an act of Congress authorizing and requiring the Secretary of the Treasury and the Commissioner of Internal Revenue to "audit and adjust" the city's claim. The amount allowed had been paid. Subsequently Congress passed another act entitling the city to a further refund, the amount to be determined in like manner. Under this second authorization, the acting Commissioner undertook to re-examine the first claim, reducing it to the extent of $3,548.89, and deducted that sum from the amount allowed on the second claim. The city recovered in the Court of Claims the amount thus deducted. On appeal the Supreme Court said: "We think the judgment of the court of claims is right. By the pay-

ment under the act of 1891 the questions involved were ended. It was not only an auditing and allowance by the proper officers of the treasury of a claim over which they had jurisdiction, but the amount was paid under the direct commandment of an act of congress specifically appropriating the particular sum reported to it as due to the city of Louisville and for the payment of which the authority of congress was needed."

We think this language is pertinent to the issue before us. To the same effect see Kendall v. United States, 12 Pet. 524, 610, 9 L. Ed. 1181; United States v. Ferreira, 13 How. 40, 47, 14 L. Ed. 42; Noble v. Union River Logging R. R. Co., 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123.

Our attention has been directed to the decision of the Court of Appeals of the District of Columbia in Northern Pacific Ry. Co. v. Interstate Commerce Commission, 57 App. D. C. 318, 23 F.(2d) 221. Because of the apparent agreement between Commission and carrier, at the suggestion of the latter, that the advance should not be final, and that liberty bonds, already on deposit, should be held as security for the refund of overpayment, if any, we agree that the decision in that case was correct as applied to the facts before the court. We cannot agree, however, that the action of the Commission there was responsive to the provisions of section 212, nor can we concur in the conclusions of the court as to the construction of that act, in view of the history of the legislation. With all due respect we feel, therefore, that that decision cannot be accepted as persuasive in the case before us.

Because of the importance of the issues involved, we have carried this discussion beyond the limits required for a determination of whether the record discloses substantial evidence sufficient to support the finding and judgment of the trial court. Our conclusion is that not only is the judgment supported by substantial evidence, but that, upon the whole record, that judgment should be affirmed. It is so ordered.