**62**

BAINS v. ENSOR.

*No. 204.*

Municipal Court of Appeals for the District of Columbia.

Sept. 28, 1944.

Foster Wood, of Washington, D. C., for appellant.

H. Clifford Allder, of Washington, D. C. (Charles E. Ford, of Washington, D. C., on the brief), for appellee.

Before RICHARDSON, Chief Judge, and CAYTON and HOOD, Associate Judges.

RICHARDSON, Chief Judge.

Appellant, an attorney, was employed to purchase outstanding tax titles to certain properties. He sued to recover an alleged overpayment which he claimed resulted from a mutual mistake in computing the aggregate total of the individual items forming the basis of the verbal agreement of sale. At the conclusion of plaintiff's evidence, the court entered judgment for defendant, appellee here.

The first negotiations leading up to the purchase had reference to sixteen lots in a subdivision known as Woodhaven. Plaintiff addressed a letter to a "Mr. E. Harmon," in whose name a tax deed had been issued. He received an answer signed "E. Harmon," and, below that signature, "J. Ensor," stating: "I will sell you the Woodhaven lots for $1000.00." He thereupon wrote defendant seeking to arrange a conference between the latter and his (plaintiff's) client. More than a month later he again wrote defendant, stating that his client had requested that he submit a counteroffer of $500 to redeem the Woodhaven lots. Again, one month later, he wrote Harmon that he had been authorized to offer $600 for a quit claim deed and stated— "Your agent, Mr. Ensor, called me the other day and refused the offer of $500.00."

During the ensuing month there were certain discussions between plaintiff and defendant concerning the Woodhaven lots and another property, described as the Alice Davis property. Plaintiff then wrote defendant, and, after discussing the condition of the Davis property, stated:

"Under the circumstances I would not be willing to pay over $300.00 for your interest in this property as you only have a tax title and I would still have to get in the outstanding record title. * * *

"On the Woodhaven proposition, I am willing to accept your offer of $700.00. If you still insist on running the two deals together, I will offer you $1,000 to settle the whole proposition."

Three weeks later plaintiff wrote defendant, enclosing two deeds to be signed by

Harmon, and requesting defendant to have them executed and to get in touch with him. It was not testified that a price had then been agreed upon.

Two months later, on January 25, 1944, a telephone conversation occurred between plaintiff and defendant. Quoting in part from the transcript of record, plaintiff "asked the defendant how much the purchase price was. The defendant answered $1817.35, whereupon the plaintiff made a notation of that on the used envelope as appears in plaintiff's Exhibit No. 14; that the plaintiff thereupon asked the defendant for a breakdown of these figures and that the defendant thereupon stated that the amount would be $400 for the Davis property, $700 for the Woodhaven lots and $317.35 for the tax refund."

These amounts plaintiff also noted on the envelope. The item of $317.35 referred to taxes Harmon had paid on the Woodhaven lots. Almost immediately after the telephone call defendant came to plaintiff's office, whereupon plaintiff prepared a check for $1817.35 and accompanied defendant to the bank where it was cashed.

Plaintiff testified that on the day in question he had returned to his office at the District Title Insurance Company, where he was employed, following an attack of influenza. He was very busy, five or six persons were there to see him and there was an accumulation of work on his desk. That evening he checked the figures when posting his books and discovered that he had paid the defendant $400 over the total of the three items. On the same evening he wrote defendant explaining the mistake and requesting return of the $400. On January 31, 1944, having had no reply to this letter, plaintiff again wrote defendant insisting upon a refund of the $400. In response plaintiff received a letter dated January 31, 1944, wherein defendant stated: "The correct figure for the Woodhaven lots is $1100.00 plus current taxes. I have already turned this money over to my client and hold receipt." In this letter defendant also offered to accept back the deed for the Woodhaven lots and refund the purchase money less attorney's fee and other expenses, the amount of which was not stated.

Plaintiff's client testified that the highest price he authorized plaintiff to offer for the Woodhaven lots was $700, plus $317.35 refund of taxes paid on these lots.

The notary public before whom the deeds to the Woodhaven lots and Alice Davis property were acknowledged was called as a witness. She testified that defendant brought a man to her office, introduced him as "E. Harmon," and she executed the acknowledgments of the two deeds. The deeds were offered in evidence. The descriptive word "unmarried" following grantor's name was ruled out in ink and the word "widow" interlined. In the acknowledgment "her" was superimposed in ink over the typewritten word "his."

Defendant, subpœnaed by plaintiff to produce records of the transaction between himself and E. Harmon with respect to the sale, testified that there were no records other than the receipt mentioned in his letter to plaintiff of January 31, 1944. This receipt he produced. It was dated February 4, 1944, signed "E. Harmon" and acknowledged receipt of $1817.35 from J. T. Ensor. Defendant was then asked to give the address of "E. Harmon" and to make known his or her identity. This question was objected to as immaterial, and the court sustained the objection.

At the conclusion of plaintiff's case defendant moved for a finding in his favor. Defendant also offered to rescind the transaction and tendered the return of the purchase price, which was refused.

█ It was incumbent upon the plaintiff to prove prima facie at least that there had been a mutual mistake in the amount of the total price charged for the properties involved, resulting from an error in adding individual items.[1] To obtain the relief sought the mistake must have been mutual; it must have been participated in by defendant. An error in calculation may require interpretation of a contract and will not necessarily invalidate it or furnish ground for rescission. Where, as here, the contract was verbal, the situation is as if in a written contract inconsistent terms appeared requiring parol evidence to determine the real intent of the parties. We find it difficult to differentiate between the instant case and the simple illustration of one purchasing various articles from a merchant who sets down the price of the several articles, erroneously computes the total which the purchaser pays without verification, later discovering the mistake.

[1] Stern v. Ace Wrecking Co., D.C.Mun. App., 38 A.2d 626.

When called upon to adjust the matter, defendant did not claim that the sum of $1817.35 had been named by him without reference to the items making up this amount. His reply, stating that the correct figure for the Woodhaven lots was $1100, instead of $700, can only be construed as an admission that the total of the three items involved was intended by him to be the purchase price. And that this was the intent of both is evidenced by the negotiations showing that the parties had in fact bargained with respect to the several properties, and that when the consideration for the deeds was named by defendant a breakdown of the amount was given by him which, as to the Woodhaven lots, apparently conformed to their previous negotiations. In holding that the naming and acceptance of the gross amount foreclosed inquiry as to the basis of the agreement and the existence of a mutual mistake, the trial court erred. If defendant, intending to charge but $700 for the release of the tax claim against the lots, by an error in addition named a sum $400 in excess of the correct total, and plaintiff being given by defendant the amount of each item, inadvertently accepted his addition, the contract, the actual meeting of the minds of the parties, is determined by what they intended to do and supposed they had done and not by an error in arithmetic.[2]

In cases of this character the law regards the amount correctly computed as the contract between the parties, substituting the real transaction for the apparent one. Consequently neither party may rescind, and an action may be brought to recover the overpayment. As was said in a case frequently cited in our courts: "Where money is paid to another under the influence of a mistake * * * an action will lie to recover it back, and it is against conscience to retain it."[3]

The real issue in the case was whether the amount agreed upon for the Woodhaven lots was $1100 or $700. The correspondence and the testimony of plaintiff supported by his contemporaneous memorandum, made a prima facie case on this issue and made it necessary for defendant to put on answering evidence.

Nor do we think the court was justified in sustaining the objection to the examination of defendant when called as a witness by plaintiff.

Defendant had said in his letter, and testified at the trial, that he had turned the entire sum over to his client, for which he held his client's receipt. The receipt produced bore a date five days after the letter was written. It will also be observed that the only answer plaintiff had received from his letters addressed to "Mr. E. Harmon" was signed "E. Harmon," below which appeared the signature "J. Ensor." The notary testified that E. Harmon was a man but the deed described her as a widow.

In cases involving fraud or such circumstances as existed here, where the intent or purpose of the defendant is in issue, it is generally necessary for a plaintiff to call the adverse party, and because of his adverse interest he may be treated as a witness on cross-examination. The purpose of such cross-examination is to elicit from the witness all of the circumstances tending to shed light on the transaction and to establish, in connection with evidence usually of a circumstantial nature, the fraud or mistake charged by the plaintiff.[4]

Since defendant claimed to have acted as agent throughout this transaction, it was proper for plaintiff to inquire concerning the identity of his principal. In view of the atmosphere of mystery surrounding the "E. Harmon" for whom defendant acted, it was not only proper but important to ascertain whether "E. Harmon" was a mythical person, a straw man, or a real principal. Plaintiff's evidence, while clear as to his own mistake in making the payment, was circumstantial as to defendant's alleged error in naming the amount. But the latter had been negatived only by defendant's assertion in his letter that the price for the Woodhaven lots was $1100, and by the statement in the same letter that he had turned over this amount to his principal. Inquiry into relations between defendant

[2] Griffin v. O'Neil, 48 Kan. 117, 29 P. 143; Smith v. Rubel, 140 Or. 422, 13 P. 2d 1078, 87 A.L.R. 644; Williston on Contracts, Rev.Ed. Sec. 1574; 40 Am.Jur., Payment, Sec. 187.

[3] Kelly v. Solari, 9 Mees. & W. 54. See United States v. Barlow, 132 U.S. 271, 10 S.Ct. 77, 33 L.Ed. 346; United States v. Carr, 132 U.S. 644, 10 S.Ct. 182, 33 L. Ed. 483; Strauss v. Hensey, 9 App.D.C. 541; Prowinsky v. Second National Bank, 49 App.D.C. 363, 265 F. 1003, 12 A.L.R. 358.

[4] Dumas v. Clayton, 32 App.D.C. 566; Bradley v. Davidson, 47 App.D.C. 266.

and his principal was foreclosed in limine by the ruling of the court. Within reasonable limits a trial court has discretion in controlling the examination of witnesses,[5] but this does not justify so rigid a limitation of examination in a case where the policy of the courts is to permit a wide latitude of inquiry.

Reversed.

[5] Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; Sidur v. Thall, D. C.Mun.App., 31 A.2d 873.