## BAYLESS v. EAGER.
### No. 9782.

Circuit Court of Appeals, Eighth Circuit.

Feb. 23, 1934.

---

Ira D. Beynon, of Lincoln, Neb. (Edgar Ferneau and John Ferneau, both of Auburn, Neb., on the brief), for appellant.

Petrus Peterson, of Lincoln, Neb. (Peterson & Devoe, of Lincoln, Neb., on the brief), for appellee.

Before GARDNER, WOODROUGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is an action at law brought by the appellant, receiver of the First National Bank of Auburn, Neb., to recover on a promissory note made and delivered by the appellee to the bank in the sum of $5,000.

A jury was waived and the case was tried to the court.

Findings of fact and conclusions of law were made and judgment ordered for the defendant. Proper steps were taken for a review in this court.

Among the facts found by the court are in substance the following: On or about June 1, 1931, appellee executed and delivered to the First National Bank of Auburn, Neb., his promissory note reading as follows:

"$5,000.00  Lincoln, Nebraska, June 1, 1931.

"On or before Dec. 1, 1931, After Date I Promise to Pay to the Order of First National Bank of Auburn, Nebr., Five Thousand Dollars Payable at Auburn, Nebraska, Value Received with Interest at 6 Per Cent Per Annum.

"Frank D. Eager.

"No. ——— Due ———  24596."

The note from the time of its delivery became a part of the assets of the bank and came duly into the possession of the appellant receiver.

At the time of the making of the note, A. J. Storms, under the trade-name of Auburn Seed Company, was engaged in buying, harvesting, storing, and marketing blue grass seed in Nebraska. W. H. Storms, son of A. J. Storms, was associated with him in the business. W. H. Bousfield was, and for many years had been, cashier and managing officer of said bank.

In prior years A. J. Storms and Bousfield had an oral agreement by which Bousfield agreed to finance the dealings of A. J. Storms in blue grass seed, and was to have 25 per cent. of the net profits for so doing. In 1930 appellee Eager had made and delivered his note for $7,500 payable to said bank, and accompanying the note was an agreement delivered to the bank by A. J. Storms and reading as follows:

"Lincoln, Nebr., June 5, 1930.

"A. J. Storms: Herewith I hand you my note for $7,500.00 payable in three months to the First National Bank of Auburn. Please send me per agreement your note for same time and amount signed by Auburn Seed Co., A. J. Storms, W. H. Storms, and W. H. Bousfield and a waiver of the First National Bank of Auburn to any claim to any part of the proceeds from the sale of any of the stripped or harvested seed until this note of mine has been paid in full. Further it is agreed that no chattel mortgages will be given covering any part of the seed stripped or harvested that will create a lien prior to the payment of my note in full.

"Sincerely,

"Frank D. Eager."

At the time of making the note in suit, a copy of the foregoing 1930 memorandum of agreement was sent by Eager to Storms with the following note attached:

"Burt: You may have papers drawn in accordance with the above copy of our last year's agreement the amount to be changed to $5000.00 instead of $7500.00. Bosford [Bousfield] will know how to draw the papers to cover all items.

"5/14/31                    Frank."

This agreement was delivered by Storms to Bousfield at the time the note in suit was delivered.

Bousfield thereupon prepared a written agreement reading as follows:

"Auburn, Nebraska, May 29, 1931.

"For and in consideration of the sum of

$5000.00 advanced to The Auburn Seed Company, by Frank D. Eager, which sum is represented by one promissory note of the said Frank D. Eager, payable to The Auburn Seed Company, it is hereby agreed and understood as follows:

"That the first money received from the sale of blue grass stripped by the Auburn Seed Company shall be paid on the principal sum of the said note; that no chattel mortgage or other lien of any nature shall be placed against the said blue grass seed, by the Auburn Seed Company, until the above described note for $5000.00 shall have been paid in full.

"That the First National Bank of Auburn, Nebraska, hereby waives any and all interest in the said seed, to be stripped, until the said note shall have been paid.

"Auburn Seed Co.
"A. J. Storms
"W. H. Storms
"W. H. Bousfield."

This agreement was signed, as indicated, by the Auburn Seed Company, A. J. Storms, W. H. Storms, and W. H. Bousfield.

The note sued upon would not have been delivered to the bank except on condition that the agreement just recited was signed by Bousfield. The note sued upon was executed and delivered as an accommodation note for the Auburn Seed Company, and was procured at the request of Bousfield, cashier and managing officer of the bank.

After the blue grass seed was harvested, it was stored in a warehouse at Kansas City, Mo., and a warehouse receipt covering the same was procured with the knowledge and at the request of Bousfield. This warehouse receipt was pledged as security for a loan with the Fidelity National Bank of Kansas City. The proceeds of the loan were placed with the Drovers' National Bank of Kansas City, to the credit of the First National Bank of Auburn.

When the proceeds of said loan thus came into the hands of the First National Bank of Auburn, Bousfield and the bank had notice and knowledge that such proceeds were placed there under a special agreement for the special purpose of paying and taking up the $5,000 note made by Eager. They also knew that the proceeds came from the loan on blue grass seed harvested by the Auburn Seed Company.

Before the proceeds came into the control of the First National Bank of Auburn, Bousfield, the cashier, had been notified by A. J. Storms for the Auburn Seed Company that the proceeds should be applied to the payment of appellee's note. Thereafter, on or about August 22, 1931, Bousfield and said First National Bank of Auburn applied said proceeds so received from the loan made upon the warehouse receipt to the payment of certain notes made by the Auburn Seed Company and held by said First National Bank of Auburn. Immediately after said notes had been charged against said account, the account showed overdrawn.

Appellee Eager had no notice or knowledge that a loan had been procured on the warehouse receipt representing said blue grass seed, or that the proceeds of said loan had been taken over and used by the bank until about September 1, 1931.

On or about September 1, 1931, A. J. Storms visited Eager and advised him that the Auburn Seed Company had pledged the warehouse receipt to the Fidelity Bank of Kansas City as security for a loan, and that the proceeds of the loan had been used by said First National Bank of Auburn to take up and pay certain notes given by the Auburn Seed Company to said bank; and thereupon A. J. Storms delivered to Eager a chattel mortgage on said seed stored in the Central Storage Warehouse subject to the lien of the Fidelity National Bank. Eager accepted and retained said chattel mortgage. Eager did not communicate with the First National Bank of Auburn until about November 17, 1931, when he wrote a letter to the receiver of said bank relative to an extension of time for payment of the $5,000 herein sued upon. About October 13, 1931, a notice had been sent by the receiver of said bank to Eager, giving the amount due on the $5,000 note.

The following findings of fact were also made by the trial court:

"26. That the defendant did not intend to waive any of his rights against the First National Bank of Auburn either by his silence or by any act or thing done by him.

"27. That the defendant did not intend to waive any rights he had against the receiver of said bank by the letter written to the receiver on November 17, 1931, plaintiff's Exhibit 8.

"28. That there is no evidence establishing the fact that either the First National Bank of Auburn or the receiver thereof were misled or changed their positions to their disadvantage in reliance upon any act or thing done or omitted to have been done by the defendant.

"29. That the defendant believed that he could not pursue any remedies against said bank or its receiver until after the maturity of the note sued on herein, to-wit, December 1, 1931.

"30. The agreement, copied as Exhibit 'H' [dated May 29, 1931], attached to defendant's answer, was signed by W. H. Bousfield for and on behalf of the First National Bank of Auburn, Nebraska, and in his capacity as cashier of said bank, and said bank thereby became a party to said agreement."

As conclusions of law, the court found that the First National Bank of Auburn had misapplied and converted the proceeds of the loan made upon the warehouse receipt to the extent of the amount of the Eager note; that, by the receipt by the bank of the proceeds of the loan on the warehouse receipt, said note was paid and discharged; that there was no waiver by Eager of his right to have the funds received by the First National Bank of Auburn applied to the payment of his note; nor was any estoppel shown against him; and, finally, the court concluded that the plaintiff was not entitled to recover in the action.

1. The more important matters in the case are the status of the agreement of May 29, 1931; the acquirement by the bank in August of the same year of the proceeds of the loan made upon the warehouse receipt; the disposition made by the bank of such proceeds; and the legal result.

The trial court has found as a fact that this agreement was signed by Bousfield for and on behalf of the bank and in his capacity as cashier of the bank, and that the bank became a party to the agreement.

This is a jury waived case, and, under the well-established rule, this finding will not be set aside if there is in the record any substantial evidence to support it. First Nat. Bank of Ortonville, Minn., v. Andresen, 57 F.(2d) 17 (C. C. A. 8); United States v. Great Northern Ry. Co., 57 F.(2d) 385 (C. C. A. 8), and numerous cases therein cited.

Among such evidence is the fact that Bousfield was the cashier and managing officer of the bank; that Bousfield himself drew the agreement and, of course, knew its contents; that the language of the agreement shows that the bank was to be a party to it; that Bousfield testified that at the time the agreement was made it was his intention that the Eager note should be paid out of the first proceeds of the sale of the seed; that the note went into the assets of the bank; that a similar arrangement had been made the year before and carried out.

In view of the foregoing, we have no difficulty in holding that there was substantial evidence in support of the finding. Further, there is no question that Bousfield knew that the proceeds of the loan made upon the warehouse receipt covering the seed came into the hands of the bank. The matter was discussed with him before the loan on the warehouse receipt was made, and there is testimony that he was expressly told after the loan was made that the proceeds placed to the credit of the bank were to be applied to the payment of the Eager note.

It is conceded that the proceeds of the loan on the warehouse receipt were used by the bank not to discharge the Eager note, but notes of the Auburn Seed Company. What was the result of the misapplication?

The trial court has found that the result was that the Eager note was paid and discharged.

We think the conclusion was right. The principle involved is well stated in Morse on Banks and Banking (6th Ed.) § 564:

"Specific Deposit to Pay Note on Acceptance.—Bank is agent of depositor, and cannot use deposit for other than the specified purpose.—If the customer gives to his banker a specific sum for the express and declared purpose of enabling the banker to pay business paper of the customer made payable at the banker's, and if the banker at the time makes no objection to this arrangement, he cannot afterward apply this sum to any other purpose; as, for example, to reimbursing himself for any sum advanced by him to his customer on overdrafts, or to the payment of checks of the customer subsequently presented. Having received the sum for a certain specified purpose, he must hold it for and apply it to that purpose, and none other, at least so long as that purpose remains unaccomplished."

In Ketchum v. St. Louis, 101 U. S. 306, 25 L. Ed. 999, the third syllabus reads as follows: "Where a debtor, by an agreement with a creditor, sets apart a fixed portion of a specific fund in the hands, or to come into the hands, of another person, whom he directs to pay it to the creditor, the agreement is, when assented to by such person, an appropriation, binding upon the parties and all who, having notice, subsequently claim under the debtor an interest in the fund." See, also, 48 C. J. pp. 642–646; Bank of Alexandria v. Saun-

ders, 2 Fed. Cas. 615, No. 852; Columbia Digger Co. v. Rector (D. C.) 215 F. 618; Oliver v. Garlick (C. C. A.) 2 F.(2d) 132; Ross v. Crane, 74 Iowa, 375, 37 N. W. 959.

■ 2. *The Question of Waiver.* This also involves a question of fact. It is a little difficult to understand the position of appellant on this question.

The waiver contended for is evidently a waiver by Eager of his right under the agreement of May 29, 1931, to have the first money derived from the seed applied on his note. This right of Eager became effective when the bank got the proceeds from the loan on the warehouse receipt in August, 1931.

However, when the bank got the proceeds, it misapplied them. Eager knew nothing of the loan or of the misapplication of the proceeds until they had both been accomplished. He first learned of them in September, 1931. Up to that time he, of course, had waived nothing. What he did afterward in taking the chattel mortgage and seeking an extension of his note when he had learned of the wrongful action of the bank was simply making the best of a bad situation.

The trial court has found that there was no intent on the part of Eager to waive any of his rights. We think the evidence amply supports the finding.

■ 3. *The Question of Estoppel.* What has been said as to waiver is pertinent also to the question of estoppel. But appellant in his brief makes the statement: "If the bank had been advised that the arrangement was not satisfactory to Eager, and that he intended to look to the first funds which the bank had received, the bank would have demanded the sale of the seed at a time when it would have brought sufficient money to pay both the bank and Eager."

Analyzing this statement, it seems to mean that, if the bank had been advised that its conversion of the funds, which it had agreed should be used to pay the Eager note, was not satisfactory to Eager, and if the bank had been told that Eager intended to look to the funds which had already been misapplied by the bank, the bank would have demanded a sale of the seed—something to which, so far as we gather from the record, it had no right.

The trial court found: "28. That there is no evidence establishing the fact that either the First National Bank of Auburn or the receiver thereof were misled or changed their positions to their disadvantage in reliance up-

on any act or thing done or omitted to have been done by the defendant."

The record, we think, supports the finding.

4. The question of tracing funds into the hands of the receiver of the bank we do not discuss, as we fail to see that the doctrine involved has any application to the facts in the case at bar.

Appellee is not seeking to have the receiver of the bank pay him any funds; but appellee is denying that the receiver has a right to recover on a note which has been paid.

The judgment is affirmed.